Rel: May 1, 2026

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2025-2026

_____

### CR-2024-0206

_____

**Marco Antonio Perez**

**v.**

**State of Alabama**

**Appeal from Mobile Circuit Court**
**(CC-23-2829)**

KELLUM, Judge.

The appellant, Marco Antonio Perez, was convicted of murdering Sean Tuder, an offense defined as capital by § 13A-5-40(a)(5), Ala. Code 1975, because, at the time he was murdered, Tuder was working as a police officer with the Mobile Police Department. The jury unanimously

found that the murder "was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody," an aggravating circumstance defined in § 13A-5-49(5), Ala. Code 1975. (C. 156.) By a vote of 11 to 1, the jury sentenced Perez to death. This appeal, which is automatic in a case involving the death penalty, followed. See § 13A-5-53, Ala. Code 1975.

Perez was charged in a six-count indictment with murdering Off. Tuder, a violation of § 13A-5-40(a)(5), Ala. Code 1975; stealing a 2013 Honda Accord, a violation of § 13A-8-17, Ala. Code 1975; stealing a 2009 Lincoln MKX, a violation of § 13A-8-3(b), Ala. Code 1975; stealing a 2011 GMC 1500 truck, a violation of § 13A-8-3(b), Ala. Code 1975; breaking and entering into a 2016 Ford F-150 with the intent to commit a theft, a violation of §13A-8-11(b), Ala. Code 1975; and stealing a Smith and Wesson .40 caliber pistol from the Ford F-150, a violation of § 13A-8-4(c), Ala. Code 1975. (C. 6-7.)[1] The Mobile Circuit Court severed the

---

[1]Perez was originally indicted in August 2019. (Suppl. C. 104-105.) He was reindicted in February 2024. (C. 6-7.)

noncapital charges from the capital-murder charge.[2] At the time that Perez shot Off. Tuder, he was 19 years old and on probation for youthful offender ("YO") adjudications. At the time of the shooting, Perez was also subject to federal pretrial-release conditions as a result of a charge for possessing a stolen firearm that he had pending in federal court.

Before trial, Perez moved for a pretrial evidentiary hearing on his motion to dismiss because, he alleged, he was immune from prosecution pursuant to § 13A-3-23(d), Ala. Code 1975. (Suppl. C. 286.) In the motion, Perez asserted that "he was justified in the shooting … when he acted in self-defense of himself or another, and consequently pursuant to Section 13A-3-23(d) is immune from the prosecution of the allegations set forth in the indictment." (Suppl. C. 286.) After a hearing and briefs, the circuit court denied Perez's motion to dismiss. (Suppl. C. 550-63.)

At trial, the State's evidence tended to show that on January 20, 2019, Perez shot and killed Off. Tuder while he was trying to apprehend Perez. Off. Tuder was a member of the Mobile Police Department Gang Unit and one of the "duties of the Gang Unit was to help find or to find

---

[2]Numerous filings were made concerning the motion to sever. A hearing was held, and the circuit court entered a lengthy order granting the motion to sever. (Suppl. C. 578-84.)

people that were wanted for felony arrests or suspects in ongoing investigations." (R. 4810.) On the day of the shooting, Off. Tuder was notified that Perez had been spotted. Off. Tuder went to the Peach Place Apartments[3] and pulled his vehicle into the parking lot and stopped. Backup officers were in route and a few minutes behind Off. Tuder. Perez walked toward his car, and Off. Tuder exited his vehicle with his gun drawn. The two struggled near the hood of the vehicle, and Perez slipped out of his jacket and got away. Perez pulled out a gun and shot Off. Tuder multiples times. Video and photographs show that, after the first shot was fired, there was a break before Perez fired two more shots.[4] Perez said in his statement to police that there was a delay because the "clip came out of the gun" and he had to put it back. (C. 1494.) The backup officers arrived and saw Perez fleeing into a nearby wooded area. He was

---

[3]Witnesses also referred to this establishment as the Peach Place "Inn."

[4]Lt. Ted Johnson of the Mobile Police Department testified that, at the scene of the shooting, police officers discovered a video-surveillance camera in one of the vacant apartments. (R. 4549.) He was able to retrieve video from that camera. That video showed the shooting, and still photographs from that video were admitted into evidence. (State's Exhibit Number 6.)

4

apprehended shortly thereafter. The coroner testified that Off. Tuder had been shot three times, that the bullets caused multiple injuries to his organs, and that he died of multiple gunshot wounds. (R. 5370.)

Sixty-nine witnesses testified at the guilt-phase of Perez's trial. Kristen Tuder May, Off. Tuder's wife, testified that, on the day of the shooting, Off. Tuder was off duty and at home but that his work telephone kept going off and she brought the phone to him. (R. 4626.) After Off. Tuder got off the phone, she said, Off. Tuder told her that he had to leave. Off. Tuder was dressed in regular clothes and left in his "regular car," she said. (R. 4627.)

Kaylie Harris testified that, at the time of the shooting, she was dating one of Perez's friends, Aedan Crosson. (R. 4504.)[5] She said that on January 19, 2019, she skipped school and was on her mother's porch when officers came to the house looking for Perez. Off. Tuder spoke to her and asked if she knew where he could locate Perez. Harris agreed to notify Off. Tuder when she heard from Perez, and they exchanged

_____

[5]On January 18, 2019, Off. Tuder and fellow officers went to Crosson's house to search for Perez. Crosson testified that he and Perez were in his bedroom and watched as the officers searched around his house. (R. 4157-58.)

telephone numbers and Snapchat mobile-messaging information. (R. 4507.) On the day of the shooting, she said, Perez reached out to her on Snapchat and asked for a ride. She told her grandfather, and her grandfather called Off. Tuder. (R. 4510.) She was told to tell Perez that her uncle would be picking him up at the Peach Place Apartments. (R. 4517.)

On January 20, 2019, Off. Tuder contacted Sgt. Paul Hosford and asked if Sgt. Hosford could assist in apprehending Perez. (R. 4681.) Sgt. Hosford testified that he and several other officers set up a perimeter around the Peach Place Apartments. "Off. Tuder was actually going to wait until he was advised that the Marco Perez subject got to the residence, after he advised us he was at the location, we could move in and do the apprehension." (R. 4683.) Off. Tuder told them that Perez was wearing a red jacket or hoodie. (R. 4685.) Sgt. Hosford said that, after Off. Tuder could not find Perez at the first location, he went to the second location and found Perez. (R. 4687.) When police turned into the parking lot they saw "Perez running across the front of the apartment buildings with a red shirt partially on. He was running towards the wood line to the southern part of the complex." (R. 4687.) They apprehended

6

Perez, and another officer informed him that someone had been shot. He picked up the red hoodie that Perez had dropped and found that it was wrapped around a black Smith and Wesson firearm. (R. 4693.) Forensic tests showed that the firearm that had been recovered had fired the shots that killed Off. Tuder.

Sgt. Dennis Owens of the Mobile Police Department testified that in January 2019 he was part of a task force with the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives and that the group investigated a stolen firearm. Perez had been indicted for possessing a stolen "Ruger model LCP 380 caliber pistol," in federal court. (R. 3792.) That indictment was issued in November 2018, and Perez was arrested for that offense on December 14, 2018. (R. 3794.) He testified that, because Perez could not be located it was his responsibility to find Perez; thus, he accompanied members of the Mobile Police Department in their efforts to locate Perez. Sgt. Owens also said that he had tracked the weapon that had been recovered from Perez after the shooting and learned that that firearm belonged to Charles Petty and that Petty had reported that his vehicle had been broken into and that the gun had been stolen. (R. 3801.)

7

Perez's mother, Tiffany Perez, testified that on December 19, 2018, she went with Perez to federal court and "signed paperwork saying that he was going to be in [her] care and custody and living at [her] home." (R. 3895). Tiffany said that on January 4, 2019, she texted Perez that his probation officer needed to talk to him. (R. 3914.) When Perez failed to return home at the end of December 2018, and when she and her husband received suspicious texts from Perez's cellular-telephone number, they called the police and reported that Perez was missing. (R. 3897.) She provided police with text messages that had been sent from Perez's cellular telephone. One message read "Marco won't be able to make it. He won't be able to make it to anything ever again in his life." (R. 3915.)

Sgt. Dorothea Long of the Mobile Police Department testified that in January 2019 she was a member of the assaults and missing-persons unit of the department. At around midnight on January 8, 2019, she received a report of a missing person and went to speak with the complainant, Perez's mother. (R. 3873.) She had the cyber-intelligence unit obtain subpoenas to track Perez's cellular telephone. (R. 3876.) Sgt. Long also obtained text messages from Perez's cellular telephone. On January 8, 2019, at around midnight, a text message from Perez's phone

8

read: "Yes, he's alive and living well. He is alive in a better place." (R. 3917.) Another text message sent at around 12:23 a.m. read: "Your son should've watched the stuff he did because now he paid the price." (R. 3918.) Police were able to find a location based on the cellular telephone, and they collected "a group to be able to go to where we thought he was and find him as well as take care of any potential harm or threat that there might've been at that location." (R. 3921.) At that point, Sgt. Long said, the police officers did not know if they were investigating a kidnapping or a missing person. Sgt. Long said that Off. Tuder was there because "he was our apprehension guy. He was the one that you called to go find people." (R. 3924-25.) When they arrived at the property, there were two buildings, a house and a trailer. They interviewed Hannah Ivy, an occupant of the trailer who knew Perez. After talking with Ivy, Sgt. Long said that she was able to determine that Perez was not a "missing or endangered person." (R. 3929.) Sgt. Long then "signed a misdemeanor warrant for filing a false police report on Marco Perez." (R. 3930.) Sgt. Long communicated with Off. Tuder frequently before Perez was located because Off. Tuder was actively searching for Perez.

After Perez left his parent's house and falsely reported that he had been kidnapped, but before he was arrested, he engaged in a 10-day crime spree in his efforts to evade police officers after he failed to contact his probation officer and after he failed to appear in federal court. He stole a Honda Accord, a Lincoln MKX, and a GMC 1500 truck. Perez also stole a .40 caliber Smith and Wesson pistol from another vehicle. Forensic tests showed that the gun that Perez stole in that 10-day period was the gun that Perez used to kill Off. Tuder.

Cpl. Jermaine Rogers of the Mobile Police Department testified that on January 20, 2019, he questioned Perez after Perez was apprehended. (R. 5058.) After he was read his Miranda[6] rights, Perez gave a statement to police. Perez told Cpl. Rogers that, the night before the shooting, he spent the night in the woods and that he would not go home, he said, because he was afraid police officers were still looking for him. Perez said that he had telephoned a bond company and that an employee of the bond company had told him that there was a warrant for his arrest for making a false police report. (C. 1479.) Perez told Cpl.

---

[6] Miranda v. Arizona, 384 U.S. 436 (1966).

Rogers that when he saw Off. Tuder get out of a car with a gun, he was "spooked." (C. 1494.) He said:

> "After I got [Off. Tuder] off me, I believe I stood up and I pulled my [gun] out. But after -- after I pulled it the first time, I don't know what happened. I just remember picking up the clip after that and running. I don't remember shooting again and again and again. And I did, I don't know why the f___ I 'd do that. But I don't remember doing that."

(C. 1505.) Perez also said that he did not know Off. Tuder was a police officer until "after the cops arrested him." (C. 1506.)

The jury convicted Perez of murdering Off. Tuder, a violation of § 13A-5-40(5), Ala. Code 1975. That statute provides that capital murder includes the

> "[m]urder of any police officer, sheriff, deputy, state trooper, federal law enforcement officer, or any other state or federal peace officer of any kind, or prison or jail guard, while the officer or guard is on duty, regardless of whether the defendant knew or should have known the victim was an officer or guard on duty, or because of some official or job-related act or performance of the officer or guard."

After a presentence investigation and report were completed, a sentencing hearing was held. Perez presented the testimony of seven witnesses in support of mitigation and a sentence of life imprisonment without the possibility of parole. The State relied on the aggravating circumstance that the murder was committed for the "purpose of avoiding

11

or preventing a lawful arrest or effecting an escape from custody." § 13A-5-49(5), Ala. Code 1975. By a vote of 11 to 1, the jury sentenced Perez to death.[7] This automatic appeal followed.

## Standard of Review

Because Perez has been sentenced to death, this Court, pursuant to Rule 45A, Ala. R. App. P., will review the proceedings for plain error. Rule 45A, as amended effective January 12, 2023, now states:

> "In all cases in which the death penalty has been imposed, the Court of Criminal Appeals may, but shall not be obligated to, <u>notice any plain error or defect</u> in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."

(Emphasis added.)

Since the amendment of Rule 45A in 2023, this Court has chosen to continue to review appeals in death-penalty cases for plain error. As we recently noted:

> "Although Rule 45A now provides that plain-error review is discretionary in such cases, this Court has explained that it will continue to conduct plain-error review in all cases in

---

[7]Effective April 11, 2017, § 13A-5-46(a), Ala. Code 1975, was amended to make the jury the sole sentencing authority for a capital-murder conviction. That amendment removed the words "an advisory verdict" and substituted the words "a verdict."

which the death penalty has been imposed. Iervolino v. State, 402 So. 3d 844, 861-62 (Ala. Crim. App. 2023). However, that does not mean that this Court will provide a detailed analysis, or even any analysis, of those claims that were not properly preserved for appellate review, as it historically did when plain-error review was mandatory. Id."

Abernathy v. State, [Ms. CR-21-0275, June 27, 2025] ___ So. 3d ___, ___

(Ala. Crim. App. 2025).

When discussing the scope of plain-error review, this Court has explained:

"Plain error is defined as error that has 'adversely affected the substantial right of the appellant.' The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is 'particularly egregious' and if it 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' See Ex parte Price, 725 So. 2d 1063 (Ala. 1998); Burgess v. State, 723 So. 2d 742 (Ala. Cr. App. 1997), aff'd, 723 So. 2d 770 (Ala. 1998); Johnson v. State, 620 So. 2d 679, 701 (Ala. Cr. App. 1992), rev'd on other grounds, 620 So. 2d 709 (Ala. 1993), on remand, 620 So. 2d 714 (Ala. Cr. App. 1993)."

Hall v. State, 820 So. 2d 113, 121-22 (Ala. Crim. App. 1999). "We use [plain error] 'sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'" Ex parte Hodges, 856 So.

2d 936, 948 (Ala. 2003) (quoting United States v. Frady, 456 U.S. 152, 163 n.14 (1982)).

Guilt-Phase Issues

I.

Perez argues that his jury did not represent a fair cross-section of the community and that, thus, his Sixth Amendment rights were violated. Specifically, he argues that he is Hispanic and charged with killing a white police officer, and Hispanics, he said, were systematically excluded from the jury venire. He contends, although 154 people were called for jury service, the jury venire consisted of only 1 Hispanic person. (Supp. C. 1210-1223.) In his brief, Perez cites the statistics that "the venire was only 0.6% Hispanic, while Mobile County at the time was 3.5% Hispanic." (Perez's brief at p. 104.)[8]

> "The Sixth Amendment requires that petit juries 'be drawn from a source fairly representative of the community.' Taylor v. Louisiana, 419 U.S. 522, 538, 95 S.Ct. 692, 702, 42 L.Ed.2d 690 (1975). When raising a claim under this requirement, a defendant 'has the burden of establishing a prima facie case of a "fair cross section" violation. Rayburn v. State, 495 So. 2d 733 (Ala. Crim. App. 1986).' Pierce v. State, 576 So. 2d 236, 241 (Ala. Cr. App. 1990), cert. denied, 576 So.

---

[8]"This Court is bound by the record and may not consider asserted facts which cannot be ascertained by the record." Richie v. State, 481 So. 2d 454, 455 (Ala. Crim. App. 1985).

14

2d 258 (Ala. 1991).  In <u>Duren v. Missouri</u>, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the United States Supreme Court held that a defendant seeking to establish a prima facie case of a violation of the fair cross-section requirement must demonstrate the following three elements:

> "'(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.'

"439 U.S. at 364, 99 S.Ct. at 668."

<u>Sistrunk v. State</u>, 630 So. 2d 147, 149 (Ala. Crim. App. 1993).  See also <u>Young v. State</u>, 375 So. 3d 813, 831 (Ala. Crim. App. 2021).

The record shows that Perez did not challenge the composition of the jury venire on the basis that it failed to represent a fair cross-section of the community.  Thus, we have no demographic information in the record concerning the breakdown by race of the population of Mobile County at the time that Perez was tried.  Nor do we have any information concerning Mobile County's method of selecting jurors.

15

Moreover, the jury list contained in the record shows that 154 prospective jurors were called for service. (Suppl. C. 1210-23.)[9] Of that number seven prospective jurors who were listed as Hispanic. After some prospective jurors were removed for cause and for various other reasons, the jury pool was reduced to 60 prospective jurors. (R. 3316.) Of those 60 prospective jurors, Perez states in his brief on appeal that there was only 1 Hispanic prospective juror that remained. However, during the final selection of the jurors, defense counsel stated in response to a question by the circuit court: "She is one of the -- she's one of two Hispanics that made the panel of 60, or one of only -- in the entirety of the panel, I think there may have been four." (R. 3435.) According to the record there were 2 Hispanic prospective jurors in the group of 60. (Suppl. C. 1210-23.)

In declining to find plain error in a capital-murder case based on a similar fact situation, this Court, in Calhoun v. State, 932 So. 2d 923 (Ala. Crim. App. 2005), stated:

_____

[9]There were two groups of prospective jurors called to the courtroom, and they were referred to as Group A and Group B. (R. 745.) Group A consisted of prospective jurors numbers 1 through 128 and Group B consisted of prospective jurors numbers 129 through 154. (Suppl. C. 1210-39.)

16

"Calhoun never challenged the method of selecting jurors used in Talladega County; therefore, the record contains no information about procedures used in Talladega County for selecting prospective jurors. Neither is there any information in the record concerning the racial makeup of the population of Talladega County. The only information on that subject is contained in Calhoun's brief. As we stated in Riddle v. State, 669 So. 2d 1014, 1016-17 (Ala. Crim. App. 1994):

> "'[E]xhibits attached to a brief are not evidence and cannot be considered by this Court on appeal. Huff v. State, 596 So. 2d 16, 19 (Ala. Cr. App. 1991). "'This Court is bound by the record [on appeal] and may not consider asserted facts which cannot be ascertained [from] th[at] record.'" Bush v. State, 616 So. 2d 394, 395 (Ala. Cr. App. 1993) (quoting Richie v. State, 481 So. 2d 454, 455 (Ala. Cr. App. 1985)).'

"Calhoun had the burden of establishing a prima facie showing of racial discrimination. As the United States Supreme Court stated in Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979):

> "'In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process.'

17

"439 U.S. at 369, 99 S.Ct. 664. Here, Calhoun failed to make even a minimal showing to satisfy the <u>Duren</u> test. There is no plain error here."

932 So. 2d at 939. See <u>Boyle v. State</u>, 154 So. 3d 171, 194-95 (Ala. Crim. App. 2013), overruled on other grounds in <u>Towles v. State</u>, 263 So. 3d 1076 (Ala. Crim. App. 2018).

Furthermore, Perez appears to argue that he is entitled to a certain number of Hispanics on his jury venire because he is Hispanic. However, this is not the standard used for assessing whether the fair-cross-section requirement has been violated. As this Court has stated:

"It is true that the particular panel from which the appellant's jury was struck contained a substantially smaller percentage of blacks than does the population of Dale County. However, the fair cross-section requirement 'ensures only a venire of randomness, one free of systematic exclusion. It does not ensure any particular venire.' Note, <u>United States v. Gelb: The Second Circuit's Disappointing Treatment of the Fair Cross-Section Guarantee</u>, 57 Brook. L. Rev. 341, 343 n. 7 (1991). 'Rather than being entitled to a cross-sectional venire,' a defendant 'has a right only to a fair chance, based on a random draw, of having a jury drawn from a representative panel.' Comment, <u>The Cross-Section Requirement and Jury Impartiality</u>, 73 Cal. L. Rev. 1555, 1565 (1985). See <u>Johnson v. State</u>, 502 So. 2d 877, 880 (Ala. Cr. App. 1987) (venire need not be '"a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group."'). Cf. <u>United States v. Percival</u>, 756 F.2d 600, 615 (7th Cir. 1985) ('It is the master jury wheel, not the actual grand jury, which must represent a fair cross section of the community. So long as the master jury wheel is

18

adequate and the prescribed procedure is thereafter followed, there can be no complaint that the panel ultimately produced by random selection is somehow under representative in result.') (citations omitted)."

Sistrunk, 630 So. 2d at 149-150.

"'[T]he American concept of the jury trial contemplates a jury drawn from a fair cross section of the community.' Taylor v. Louisiana, 419 U.S. 522, 527, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). Under the Sixth Amendment, 'petit juries must be drawn from a source fairly representative of the community'; however, an accused is 'not entitled to a jury of any particular composition.' Id. at 538, 95 S.Ct. 692. '"[I]t is the source from which the venire is selected that must be fairly representative of the community, rather than the jury actually chosen."' Gamble v. State, 791 So. 2d 409, 425 (Ala. Crim. App. 2000), quoting Travis v. State, 776 So. 2d 819, 838 (Ala. Crim. App. 1997), aff'd, 776 So. 2d 874 (Ala. 2000)."

Gavin v. State, 891 So. 2d 907, 945 (Ala. Crim. App. 2003). Perez is not entitled to a jury of any specific racial composition.

Given that Perez did not make a fair-cross-section argument at trial, we find that the "record fails to establish any Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), violation." Boyle v. State, 154 So. 3d at 194-95. For the reasons stated in Calhoun, supra, Perez failed to make "even a minimal showing" that he is not entitled to relief. 932 So. 2d at 939. Accordingly, Perez is due no relief on this claim.

19

II.

Perez next argues that he was deprived of his constitutional right to an impartial jury because the circuit court declined to remove for cause four prospective jurors who, he says, were prejudiced against him. He specifically challenges the circuit court's failure to remove prospective jurors C.T., S.E., C.M., and W.M.[10]

> "To justify a challenge for cause, there must be a proper statutory ground or '"some matter which imports absolute bias or favor, and leaves nothing to the discretion of the trial court."' Clark v. State, 621 So. 2d 309, 321 (Ala. Cr. App. 1992) (quoting Nettles v. State, 435 So. 2d 146, 149 (Ala. Cr. App. 1983)). This Court has held that 'once a juror indicates initially that he or she is biased or prejudiced or has deep-seated impressions' about a case, the juror should be removed for cause. Knop v. McCain, 561 So. 2d 229, 234 (Ala. 1989). The test to be applied in determining whether a juror should be removed for cause is whether the juror can eliminate the influence of his previous feelings and render a verdict according to the evidence and the law. Ex parte Taylor, 666 So. 2d 73, 82 (Ala. 1995). A juror 'need not be excused merely because [the juror] knows something of the case to be tried or because [the juror] has formed some opinions regarding it.' Kinder v. State, 515 So. 2d 55, 61 (Ala. Cr. App. 1986). Even in cases where a potential juror has expressed some preconceived opinion as to the guilt of the accused, the juror is sufficiently impartial if he or she can set aside that opinion and render a verdict based upon the evidence in the case. Kinder, [515 So. 2d] at 60-61. In order to justify disqualification, a juror '"must have more than a bias, or fixed

---

[10]To protect the anonymity of the prospective jurors, we use their initials.

opinion, as to the guilt or innocence of the accused"'; '"[s]uch opinion must be so fixed ... that it would bias the verdict a juror would be required to render."' Oryang v. State, 642 So. 2d 979, 987 (Ala. Cr. App. 1993) (quoting Siebert v. State, 562 So. 2d 586, 595 (Ala. Cr. App. 1989))."

Ex parte Davis, 718 So. 2d 1166, 1171-72 (Ala. 1998). "[J]urors who give responses that would support a challenge for cause may be rehabilitated by subsequent questioning by the prosecutor or the Court." Johnson v. State, 820 So. 2d 842, 855 (Ala. Crim. App. 2000).

"A trial judge's finding on whether or not a particular juror is biased 'is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province.' [Wainwright v.] Witt, 469 U.S. [412,] 429, 105 S. Ct. [844,] 855 [(1985)]. That finding must be accorded proper deference on appeal. Id. 'A trial court's rulings on challenges for cause based on bias [are] entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion.' Nobis v. State, 401 So. 2d 191, 198 (Ala. Cr. App.), cert. denied, Ex parte Nobis, 401 So. 2d 204 (Ala. 1981)."

Martin v. State, 548 So. 2d 488, 490-91 (Ala. Crim. App. 1988). "[E]ven though a prospective juror admits to a potential bias, if further voir dire examination reveals that the juror can and will base his decision on the evidence alone, then a trial judge's refusal to grant a motion to strike for cause is not error." Perryman v. State, 558 So. 2d 972, 977 (Ala. Crim. App. 1989).

21

Moreover, the record shows that defense counsel removed all the challenged prospective jurors with his peremptory strikes. Defense counsel used his first peremptory strike to remove C.T., his second strike to remove S.E., his ninth strike to remove C.M., and his tenth strike to remove W.M. (Suppl. C. 1224.) None of the now-challenged prospective jurors sat on Perez's jury. Alabama has returned to a harmless-error analysis when evaluating the validity of a circuit court's ruling on a challenge for cause.

> "The Alabama Supreme Court in <u>Bethea v. Springhill Memorial Hospital</u>, 833 So. 2d 1 (Ala. 2002), returned to the harmless-error analysis when reviewing a circuit court's refusal to remove a prospective juror for cause. The Supreme Court stated:
>
>> "'The application of a "harmless-error" analysis to a trial court's refusal to strike a juror for cause is not new to this Court; in fact, such an analysis was adopted as early as 1909:
>>
>>> "'"The appellant was convicted of the crime of murder in the second degree. While it was error to refuse to allow the defendant to challenge the juror C.S. Rhodes for cause, because of his having been on the jury which had tried another person jointly indicted with the defendant, yet it was error without injury, as the record shows that the defendant challenged said juror peremptorily, and that, when the

jury was formed the defendant had not exhausted his right to peremptory challenges.'

"'Turner v. State, 160 Ala. 55, 57, 49 So. 304, 305 (1909).  However, in Swain v. Alabama, 380 U.S. 202, 219, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), overruled on other grounds, Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court stated, in dicta, that "[t]he denial or impairment of the right is reversible error without a showing of prejudice." (Emphasis added [in Bethea].)  Some decisions of this Court as well as of the Alabama Court of Criminal Appeals reflect an adoption of this reasoning.  See Dixon v. Hardey, 591 So. 2d 3 (Ala. 1991); Knop v. McCain, 561 So. 2d 229 (Ala. 1989); Ex parte Rutledge, 523 So. 2d 1118 (Ala. 1988); Ex parte Beam, 512 So. 2d 723 (Ala. 1987); Uptain v. State, 534 So. 2d 686, 688 (Ala. Crim. App. 1988) (quoting Swain and citing Beam and Rutledge); Mason v. State, 536 So. 2d 127, 129 (Ala. Crim. App. 1988) (quoting Uptain).

"'... [T]his Court has returned to the "harmless-error" analysis articulated in the Ross v. Oklahoma, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), and [United States v.] Martinez-Salazar, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000), decisions. Because a defendant has no right to a perfect jury or a jury of his or her choice, but rather only to an "impartial" jury, see Ala. Const.1901 § 6, we find the harmless-error analysis to be the proper method of assuring the recognition of that right.

"'In this instance, even if the Betheas could demonstrate that the trial court erred in not

23

> granting their request that L.A.C. be removed from the venire for cause (an issue we do not reach), they would need to show that its ruling somehow injured them by leaving them with a less-than-impartial jury. The Betheas do not proffer any evidence indicating that the jury that was eventually impaneled to hear this action was biased or partial. Therefore, the Betheas are not entitled to a new trial on this basis.'

"833 So. 2d at 6-7 (footnotes omitted). See also Dailey v. State, 828 So. 2d 340 (Ala. 2001). As was the case in Bethea, Calhoun offers no evidence that the jury ultimately impaneled was biased; therefore, if error occurred it was harmless."

Calhoun, 932 So. 2d at 944-45 (footnote omitted). Compare Ex parte Colby, 41 So. 3d 1 (Ala. 2009); General Motors Corp. v. Jernigan, 883 So. 2d 646 (Ala. 2003) (harmless-error analysis does not apply when the circuit court erroneously denies challenges for cause of multiple jurors).

In this case, the prospective jurors completed extensive 15-page juror questionnaires.[11] Those questionnaires contained numerous

---

[11]The handling of juror questionnaires on appeal is addressed in Rule 18.2, Ala. R. Crim. P., which states:

> "If a juror questionnaire containing personal information is obtained from a prospective juror in any case appealed to the Court of Criminal Appeals, that questionnaire shall not be included in the clerk's portion of the record on appeal. If any party raises an issue on appeal that relates to information contained in a questionnaire, the appellate court may order the record on appeal to be supplemented to include

24

questions about their views on the justice system, law enforcement, and the death penalty. Perez requested that the juror questionnaires be forwarded to this Court. Pursuant to Rule 18.2, Ala. R. Crim. P., this Court directed the Mobile Circuit Clerk to forward those questionnaires to this Court. Juror questionnaires are part of the voir dire process and are properly considered when determining the validity of a challenge for cause. See Scott v. State, 163 So. 3d 389, 423 (Ala. Crim. App. 2012). We now separately address Perez's arguments regarding each challenged prospective juror.

## A.

Perez first argues that the circuit court erred in declining to remove prospective juror C.T. for cause because, he says, she indicated that, if

---

any or all questionnaires at issue. Upon final disposition of the appeal, any questionnaires in the appellate court's possession by virtue of supplementation of the record shall be returned to the clerk of the trial court. Any such questionnaires supplemented into the appellate record shall be available for inspection only by the court and the parties to the appeal."

(Emphasis added.) That rule was amended effective August 1, 2002, to "maintain the confidentiality of the information provided in the questionnaires." Committee Comment to Amendment to Rule 18.2, Ala. R. Crim. P., Effective August 1, 2002.

25

Perez was convicted of capital murder, she would automatically vote for the death penalty.

The voir dire examination of the prospective jurors was extensive and includes more than 2,500 pages of the record.[12] (R. 756-3316.) The prospective jurors were questioned in groups (R. 756-1042) and were questioned individually. (R. 1043-3315.) Each prospective juror questioned individually was asked numerous questions concerning his or her written responses to questions on the questionnaires. There was a lengthy discussion concerning C.T.'s responses on her questionnaire during voir dire examination. Question number 60 on the questionnaire read: "Which statement best summarizes your general views about capital punishment (the death penalty)?" There were 6 responses that the prospective jurors could circle. C.T. circled response number 4 that read: "I am in favor of capital punishment except in a few cases where it may not be appropriate." She also wrote the following explanation: "I have always said, 'An eye for an eye.' But, it would be hard to circle

---

[12]One thousand pages of the voir dire examination were omitted from the original record. Those pages are contained in the supplemental record. (Suppl. R. 1001-2000.)

26

number 6[13] because there are circumstances for everything. Mental conditions, self-defense, etc." (C.T.'s juror questionnaire, p. 13.) The next question on the questionnaire asked: "Assume you are on a jury to determine the punishment for a defendant who has already been convicted of capital murder. If the law gives you a choice of death or life imprisonment:" C.T. circled the response that read: "My decision on whether to impose the death penalty would depend upon the facts and circumstances of a particular case." (C.T.'s juror questionnaire, p. 14.)

During voir dire, C.T. initially stated:

"THE COURT: Would you be able to at least temporarily set aside any personal beliefs that you have as reflected in this questionnaire, or otherwise, then follow your oath of service as a juror, follow my instructions as to the law, and consider both life without parole and the death penalty, and then vote for either the death penalty or vote for life without parole, as you may find them appropriate in that weighing process I told you?

"P.J. [C.T.]: Yes, sir."

(R. 2347.) However, when C.T. was questioned further by the circuit court, the following occurred:

---

[13]Response number 6 to Question 60 read: "I will always vote for the death penalty for the crime of intentional murder no matter what mitigating circumstances are present."

27

"THE COURT: If there's a penalty phase in this case, would you, despite my instructions, automatically vote in favor of the death penalty in every case where a defendant had been convicted of capital murder, regardless of the mitigating factors and or aggravating factors, regardless of the facts and circumstances, would you do that?

"P.J. [C.T.]: Would I?

"THE COURT: You want me to rephrase it?

"P.J. [C.T.]: Yes. Yes, sir.

"THE COURT: If there's a penalty phase in the case, would you, despite my instructions about these factors, automatically vote in favor of the death penalty in every case where the defendant had been proven beyond a reasonable doubt guilty of capital murder, regardless of the facts and circumstances?

"P.J. [C.T.]: Yes."

(R. 2362-63.) As noted above, C.T.'s responses were inconsistent. Defense counsel then indicated that he had a problem with C.T.'s remaining on the venire and stated that she should be removed.

The circuit court explained why it was denying Perez's motion to strike C.T. for cause:

"I don't think it's a close call, really. She didn't say I believe in an eye for eye, or I'm going to require an eye for an eye. She said, I've always said an eye for an eye, but -- but it would be hard to circle Number 6.

28

"And she didn't circle Number 6. She circled Number 4. You keep reading Number 6, but she circled Number 4. She said it would be hard to circle Number 6 because there are circumstances for everything, mental conditions, self-defense, et cetera. There may be others she said.

"And I asked her repeatedly could she consider both and vote for either one. She clearly is a person who will consider the death penalty. You would consider her pro death penalty. She actually considered Paragraphs 4 and 3 on the questionnaire.

"It could be debated whether she really hesitated in death penalty or not. She actually hesitated in response to one of the State's questions about whether she would impose the death penalty. I heard that. So I don't know that she is pro death penalty.

"But given the totality of what's presented to me, the questionnaire, her demeanor, her credibility in her answers, the answers she gave to me as the neutral instead of the questions that are very often framed by each side in a leading manner -- they can appear to be -- presented with some pressure, as if you're seeking a particular answer. That's the way these people may see this, and I see that with some of these jurors, too.

"The totality of factors and circumstances, the Court finds that your challenge is due to be denied."

(R. 2369.)

"Because the qualification of a juror is a matter within the discretion of the trial judge, on appeal this Court will look to the questions asked and the answers given only to see if the trial court's

29

discretion was properly exercised." Ex parte Cochran, 500 So. 2d 1179, 1183 (Ala. 1985). "A trial judge's finding on whether or not a particular juror is biased 'is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province.' ... That finding must be accorded proper deference on appeal." Martin v. State, 548 So. 2d 488, 490-91 (Ala. Crim. App. 1988). Given that C.T.'s responses were inconsistent, we must give considerable deference to the circuit court, who was present and could see the juror's demeanor during questioning. We cannot say that the circuit court abused its discretion in denying Perez's motion to remove C.T. for cause.

Moreover, the record shows that defense counsel removed C.T. by the use of his first peremptory strike. (Supp. C. 1224.) She did not serve on Perez's jury; therefore, any possible error was harmless. See Calhoun. 932 So. 2d at 944-45. For the above reasons, Perez is due no relief on this claim.

## B.

Perez next argues that the circuit court erred in denying his motion to remove prospective juror S.E. for cause because, he argues, this

prospective juror clearly expressed that he would automatically vote for the death penalty.

The record shows that S.E. indicated on the questionnaire in response to Question 60: "I'm for the death penalty in practically all murders, especially crimes against women and children who are defenseless." (S.E.'s juror questionnaire, p. 13.) During voir dire questioning, S.E. said:

> "Well, after what he said -- after what the judge said, if the -- he described the two factors, mitigating and the other one. If the -- if the reasons for life in prison are greater than the reasons for death, I would probably -- I might go with life in prison as opposed to death. …
>
> "Maybe if the person had kids and the kids -- you know, spending the rest of their life in prison anyway, but if they have kids, I mean, you know, I wouldn't want to take a father from the kid, maybe the kids would want to come see him, you know, something along those lines. That would be something that tugged at my heart strings not to --
>
> "I mean, I would have to hear everything he said -- I'm sorry -- and just know about it."

(R. 1542-43.) S.E. also gave examples of more factors that he would consider before voting for any sentence.

Defense counsel indicated that he did not "think [S.E.] could be a fair juror in this case and impose life without parole under the

31

circumstances and conditions the Court may instruct him to do." (R. 1545.) The circuit court responded: "Given the totality of the facts and circumstances and the demeanor of the witness, the very candid and respectful manner in which he accepted the authority of this Court to give these instructions, the Court respectfully denies the challenge for cause." (R. 1547.)

The above quotes from the record show that S.E. indicated that he would follow the instructions given by the circuit court. Given S.E.'s responses, we cannot say that the circuit court abused its considerable discretion in denying Perez's motion to remove S.E. for cause after he was rehabilitated. See <u>Martin v. State</u>, supra.

Furthermore, S.E. did not serve on Perez's jury but was removed when defense counsel used his second peremptory strike. (Supp. C. 1224.) Thus, any error in denying the challenge for cause was harmless. See <u>Calhoun</u>, supra. For these reasons, Perez is due no relief on this claim.

## C.

Perez next argues that the circuit court erred in not granting his challenge for cause of prospective juror C.M. because, he says, C.M.'s

responses on her questionnaire indicated that she was in favor of the death penalty when someone kills another.

The record shows that, in response to Question 60, C.M. wrote: "Simply put: You kill someone and all the evidence is there then you should be up for capital punishment." (C.M.'s juror questionnaire, p. 13.) In response to Question 61, she indicated: "I would usually vote to impose the death penalty in a case where the law allows me to do so." (C.M.'s juror questionnaire, p. 14.)

When C.M. was questioned about her responses, she said that she could set aside her personal beliefs about the death penalty. (R. 1967.) The following occurred:

> "THE COURT: But I ask you this. Would you be able to set aside, at least temporarily, any personal beliefs that you have about the death penalty, one way or another?
>
> "P.J. [C.M.]: I could.
>
> "THE COURT: You follow? It's a longer --
>
> "P.J. [C.M.]: Sorry.
>
> "THE COURT: Would you be able to set aside your personal beliefs, whatever they are, about the death penalty, follow your oath as a juror and my instructions as to the law, and consider both life without parole and the death penalty in this weighing process during the penalty phase, and then vote for either life without parole or the death penalty, depending

33

upon where you find that weighing process takes you under the law and the facts? Could you do both?

"P.J. [C.M.]: Yes, sir.

"THE COURT: Could you vote for either one?

"P.J. [C.M.]: I could."

(R. 1967.) C.M. was questioned further by both parties. When denying Perez's motion to remove C.M. for cause, the circuit court stated:

"So considering the totality of the evidence -- testimony of the juror, the questionnaire, body language, the body language including repeatedly throughout -- particularly after the Court defined the weighing process, the death penalty, she would do the scales of justice symbol with her hands when she was answering, the Court finds her testimony has been very credible, and the Court finds that she is an appropriate juror."

(R. 1983.)

Clearly C.M. indicated that she would follow the law. The circuit court did not abuse its discretion in denying the motion to remove C.M. for cause. See Martin v. State, supra. Accordingly, Perez is due no relief on this claim.

D.

Perez next argues that the circuit court erred in denying his request to remove prospective juror W.M. for cause because, W.M. says, he indicated that he was strongly in favor of the death penalty.

34

The record shows that, in response to Question 60, W.M. wrote: "I believe in an eye for an eye, tooth for tooth. If you take a life intentionally and maliciously." (W.M.'s juror questionnaire, p. 13.) The circuit court asked W.M. if he could follow its instructions regarding whether a sentence of life without parole or a death sentence was appropriate. W.M. indicated that he could set aside his opinions and follow the law as instructed by the court. (R. 2509.) After questioning, defense counsel moved that W.M. be struck for cause because of his strong feelings in favor of the death penalty. The circuit court stated:

"[W.M.] says I can set aside my personal views. He said it repeatedly, and he really was unequivocal, even on sort of cross-examination by the Defense.

"He went into mitigating factors in answer to the Defense's questions. So, the Court finds he's death qualified. He's confirmed, and he's very credible to me that he can set aside any personal experiences that he's had. So the Court will respectfully seat the juror and overrule the challenge by the Defense."

(R. 2525-26.) W.M.'s responses indicated that he could set aside any personal views and render a verdict based on the circuit court's instructions. The circuit court did not err in denying Perez's motion to remove W.M. for cause. See Ex parte Davis, 718 So. 2d 1166, 1171 (Ala. 1998). For these reasons, Perez is due no relief on this claim.

35

III.

Perez next argues that the circuit court erred in denying his <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986), motion because, he says, the State used its peremptory strikes "in a racially discriminatory manner." (Perez's brief at p. 73.)

In <u>Batson</u>, the United States Supreme Court held that it was a violation of the Equal Protection Clause of the United States Constitution to remove black jurors from a black defendant's jury based solely on their race. This holding was extended to white defendants, <u>Powers v. Ohio</u>, 499 U.S. 400 (1991); to defense counsel in criminal cases, <u>Georgia v. McCollum</u>, 505 U.S. 42 (1992); and to gender, <u>J.E.B. v. Alabama</u>, 511 U.S. 127 (1994).

> "'When reviewing a trial court's ruling on a <u>Batson</u> motion, this Court gives deference to the trial court and will reverse a trial court's decision only if the ruling is clearly erroneous.' <u>Yancey v. State</u>, 813 So. 2d 1, 3 (Ala. Crim. App. 2001). 'A trial court is in a far better position than a reviewing court to rule on issues of credibility. <u>Woods v. State</u>, 789 So. 2d 896, 915 (Ala. Crim. App. 1999). 'Great confidence is placed in our trial judges in the selection of juries. Because they deal on a daily basis with the attorneys in their respective counties, they are better able to determine whether discriminatory patterns exist in the selection of juries.' <u>Parker v. State</u>, 571 So. 2d 381, 384 (Ala. Crim. App. 1990)."

<u>Doster v. State</u>, 72 So. 3d 50, 73-74 (Ala. Crim. App. 2010).

36

The record shows that 60 prospective jurors remained out of the 154 that were called for jury service after some prospective jurors were removed for cause and for various other reasons. (R. 3340.) The State had 20 peremptory strikes.[14] After the peremptory strikes were completed, defense counsel made a Batson objection. (R. 3339.) He argued that out of the 60 prospective jurors in the venire, only 15 of those prospective jurors were minorities and that the State had used 70% of its strikes to remove minorities. (R. 3340-41.) The circuit court found a prima facie case under Batson. (R. 3346.)

The State gave very detailed and multiple reasons for all of its peremptory strikes. There was also a discussion about whether Perez had violated Batson by striking only white prospective jurors and not removing one minority. At the conclusion of that discussion, the circuit court agreed to substitute two black prospective jurors that the State had struck for two white prospective jurors from the final jury. (R. 3461.)

> "[Prosecutor]: This is the agreement with [Perez] waiving all Batson challenges. And [Perez] agreeing that this is a strategic decision by the Defense to accept and waive any

---

[14]"Rule 18.4(g)(3), Ala. R. Crim. P., provides that the last person or persons struck shall be the alternates. For purposes of Batson we view the alternate jurors as having been struck." Thompson v. State, 153 So. 3d 84, 124 n.11 (Ala. Crim. App. 2012).

challenges and that this is a tactical strategic choice. So we have to have that agreement with the Defense.

"THE COURT: Is that right, [defense counsel]?

"[Defense counsel]: That is correct.

"[Prosecutor]: And that the State also agrees to not raise its own Batson challenge and require [Perez] to give their race neutral reasons for striking all white members of the jury."

(R. 3461-62.)

That discussion shows that Perez waived any Batson objection. This Court recognized in Calhoun, 932 So. 2d at 942-43, that a Batson objection could be affirmatively waived by a defendant's attorney. A waived error or an invited error is reviewed only for plain error. See Ex parte Bankhead, 585 So.2d 112, 126 (Ala.1991). This Court has held that it will no longer review a Batson claim for plain error. See Henderson v. State, [Ms. CR-21-0044, May 3, 2024] ___ So. 3d ___, ___ (Ala. Crim. App. 2024).

Also, when the circuit court proposed that two black prospective jurors be placed on the jury and two white prospective jurors be removed, Perez did not object to the circuit court's method of handling the Batson issue.

"In light of the variety of jury selection practices followed in our state and federal trial courts, we make no attempt to instruct these courts how best to implement our holding today. For the same reason, we express no view on whether it is more appropriate in a particular case, upon a finding of discrimination against black jurors, for the trial court to discharge the venire and select a new jury from a panel not previously associated with the case ... or to disallow the discriminatory challenges and resume selection with the improperly challenged jurors reinstated on the venire ...."

Batson, 476 U.S. at 99 n.24.

Furthermore, the State gave detailed reasons for each of its peremptory strikes and the State had multiple reasons for striking each minority prospective juror. (R. 3347-3454.) Minority prospective jurors were struck based on their opposition to the death penalty -- A.H., T.D., T.M., D.J. Prospective juror A.S. was struck because he had shot a person in self-defense. Prospective jurors T.W. and M.B. were struck because they had relatives with criminal convictions. Prospective juror Z.B. was struck because he had been court-martialed for theft while in the Marine Corps. Prospective jurors L.H. and C.D. were struck because they had negative encounters with police -- L.H. said that her husband had frequently been targeted by police, and C.D. said that he had been wrongfully accused and acquitted of a crime. Prospective juror J.L. was struck because she was a police officer who taught police procedure and

the prosecutor was concerned that she would question the police procedural decisions that were made in Perez's case. None of the above reasons violate Batson. See Acklin v. State, 790 So. 2d 975, 988 (Ala. Crim. App. 2000) ("Mixed feelings or reservations regarding imposition of the death penalty are valid race-neutral reasons for peremptory strikes."); Ex parte McNair, 653 So. 2d 353, 356 (Ala. 1994) ("Striking the relative of a person who has been convicted of a crime is racially neutral."); Spencer v. State, 659 So. 2d 1000, 1002 (Ala. Crim. App. 1994) ("[T]his court has repeatedly held that striking a juror with a criminal history does not violate Batson."); Stephens v. State, 580 So.2d 11, 19 (Ala. Crim. App. 1990) ("A hostile attitude toward law enforcement or dissatisfaction with the police has also been upheld as a sufficiently race-neutral explanation for the use of a peremptory challenge."); Allen v. State, 659 So. 2d 135, 147 (Ala. Crim. App. 1994) ("Within the context of Batson, a 'race-neutral' explanation 'means an explanation based on something other than the race of the juror.").

After reviewing the record, we cannot say that the circuit court abused its considerable discretion in its manner of handling the Batson motion. For these reasons, Perez is due no relief on this claim.

IV.

Perez also contends that the circuit court erred in allowing the State to present evidence indicating that, six months before this shooting, Perez had eight prior adjudications for breaking and entering into motor vehicles and was granted YO status in each case. At the time of the murder, Perez was on probation for YO adjudications. He asserts that the State presented this evidence by admitting the probation order related to those offenses, Snapchat messages, and the testimony of Perez's probation officer. Perez's entire argument in his original brief appears to be that because he was granted YO status in those cases, according to § 15-19-5, Ala. Code 1975, any reference to those adjudications was barred by law because, he says, "juvenile adjudications 'shall not be admissible as evidence against [the defendant] in any case or proceeding in any other court.'" (Perez's brief at p. 36.)[15]

---

[15]Section 15-19-7(a), Ala. Code 1975, reads: "No determination made under the provisions of [the Youthful Offender Act] shall disqualify any youth for public office or public employment, operate as a forfeiture of any right or privilege or make him ineligible to receive any license granted by public authority, and such determination shall not be deemed a conviction of crime; provided, however, that if he is subsequently convicted of crime, the prior adjudication as youthful offender shall be considered." (Emphasis added.)

41

Perez filed a motion in limine and argued that the State should be prevented from presenting evidence of any outstanding warrants against Perez at the time of the shooting. Perez argued that he "had a warrant outstanding for violations of pretrial release in federal court. There were no other outstanding warrants unless they were for violations of YO probation, which is obviously confidential and would not be proper to be disclosed." (Supp. C. 954.) Perez also objected to the introduction of prior-act evidence under Rule 404(b), Ala. R. Evid. (Supp. C. 988.) Perez argued that the prior-act evidence should have been excluded because that evidence was not relevant to "intent or any other exception under Rule 404(b)." (Supp. C. 988.) This issue was addressed at a pretrial hearing. After a lengthy argument, the circuit court stated:

> "Because you have a defense of self-defense in which there's an issue of whether his conduct was justified, who the initial aggressor was, all of these things.
>
> "This evidence bears substantively on those things, whether he was justified in his conduct, his probation status, whether he had missed a Federal Court hearing, was he justified in acting that way? These things are related. And so there's a really compelling argument it's not even [Rule] 404 evidence.
>
> "I'm going to rule that the -- look. I'm going to give you both time. If you come up with any case law, just let me know.

If you find some cases that say, look, this is Youthful Offender, you can't talk about it no matter what.

"But, to me, at the end of the day, this journey we're on in this case, the same as every case, which is a search for the truth. We're in a search for the truth. And the truth is he was on probation when this happened. And to artificially impose a standard in a case involving a charge of murder, that you can't talk about the probation status because it happened to be Youthful Offender when the probation status I find to be intricately intertwined with the facts and timeline in that last 10 to 14 days, it's intricately intertwined with it.

"And so I'm going to rule that you'll just say he's on a Circuit Court probation."

(R. 3650-51.) At the conclusion of that hearing, the circuit court stressed that its ruling was conditional and was subject to modification depending on the facts developed at trial. (R. 3665.)

"It is the law 'that an appellant who suffers an adverse ruling on a motion to exclude evidence (or other matters, e.g., argument of counsel), made in limine, preserves this adverse ruling for post-judgment and appellate review only if he objects to the introduction of the proffered evidence or other matters and assigns specific grounds therefor at the time of trial, unless he has obtained express acquiescence of the trial judge that such subsequent objection to evidence proffered at trial and assignment of grounds therefor are not necessary."

Phillips v. State, 527 So. 2d 154, 156 (Ala.1988).

The State first argues that this issue is not preserved for appellate review because the pretrial ruling was conditional and no objection was

43

made when the evidence was admitted and that, therefore, we should only apply the plain-error standard of review to this claim. It is clear from a review of the pretrial hearing that the circuit court's ruling was not final but was conditional and could be revisited based on the evidence that was presented at trial.

The record further shows that Cassius Williams from the Alabama State Bureau of Probation testified that he was Perez's probation officer for cases out of Mobile County. (R. 3837.) He did not identify the specific crimes that formed the basis for Perez's probation. There was no objection to Williams's testimony. Again, when the State moved to admit the order of probation, defense counsel, in response to the circuit court's question, specifically stated that he had no objection. (R. 3834.) Yet again, when Snapchat messages between Perez and Savannah Brewer, the mother of Perez's child, that referred to Perez being on probation were introduced, the only objections were that those messages were not relevant and were hearsay. (R. 4177.) When Brewer testified that she had texted with Perez and had said: "Your probation officer even called to talk to -- called your mom to talk to you" (R. 4237), no objection was made. When Sgt. Lorenzo Matthews was asked about Perez, he said that

44

Perez had a probation violation. No objection was made to that testimony. (R. 4815.) Therefore, our review of this issue is for plain error. See Rule 45A, Ala. R. App. P.

Rule 404(b)(2), Ala. R. Evid., provides exceptions to the general exclusionary rule and states that evidence of other crimes may be admissible: "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." "The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court's determination on that question will not be reversed except upon a clear showing of abuse of discretion." Ex parte Loggins, 771 So.2d 1093, 1103 (Ala. 2000).

The State asserts that though Perez was on probation for YO adjudications, they were properly admitted pursuant to Rule 404(b), Ala. R. Evid., to show Perez's motive to kill Off. Tuder. It cites the case of Williams v. State, 389 So. 3d 385 (Ala. Crim. App. 2023), to support its argument.

In Williams, this Court considered the scope of § 15-19-5, Ala. Code 1975, as it related to the admission of a YO adjudication to show the defendant's motive:

"The circuit court ruled that § 15-19-5, Ala. Code 1975, did not 'exclude evidence of a youthful offender plea' and that 'there is no code section that excludes evidence of a youthful offender plea being admissible for anything other than sentencing.' (R. 14.) When asked to further explain how the previous conviction showed motive, the State explained:

"'To the issue of motive, motive in the case that we represented to Your Honor, Brownlee v. State, [197 So. 3d 1024 (Ala. Crim. App. 2015),] case is very similar in that the State was trying to introduce prior bad acts or uncharged, actual, victims in the case, that he was charged with rape and it was a similar - - so the motive as defined is an inducement or that which leads or attempts to do or commit the crime. ...

"'Specifically, in this case -- the caselaw in this case talks about the testimony regarding collateral acts of sexual abuse was admissible to show the defendant's motive, i.e., his unnatural sexual desire for young girls.'

"(R. 19-20.) The circuit court found that the prior act was admissible to establish motive and that 'its probative value is substantial in this case and is not outweighed by the prejudicial effect to [Williams].' (R. 22-23.)

"....

"'The decision whether to allow or not to allow evidence of collateral crimes or acts as part of the State's case-in-chief rests within the sound discretion of the trial judge.' Blanco v. State, 515 So. 2d 115, 120 (Ala. Crim. App. 1987). When discussing the application of Rule 404(b), Ala. R. Evid., this Court has stated:

46

"'Rule 404(b), Ala. R. Evid., provides, in pertinent part:

"'"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident....'

"'A trial judge should exclude evidence falling within one of the exceptions listed in [R]ule 404(b) only if the probative value of that evidence is substantially outweighed by the danger of unfair prejudice. See Ex parte Register, 680 So. 2d 225 (Ala. 1994).

"'Under the general exclusionary rule in Rule 404(b), a prior act of sexual abuse would be inadmissible. However, in this case, the alleged prior bad act was offered to prove motive.

"'"'Motive is defined as "an inducement, or that which leads or tempts the mind to do or commit the crime charged." Spicer v. State, 188 Ala. 9, 11, 65 So. 972, 977 (1914). Motive has been described as "that state of mind which works to "supply the reason that nudges the will and prods the mind to indulge the criminal intent.'" [Charles Gamble, Character Evidence: A Comprehensive Approach 42 (1987).]

"'"'Furthermore, testimony offered for the purpose of showing motive is always admissible. McClendon v. State, 243 Ala. 218, 8 So. 2d 883 (1942). Accord, Donahoo v. State, 505 So. 2d 1067 (Ala. Cr. App. 1986). "'It is permissible in every

47

criminal case to show that there was an influence, an inducement, operating on the accused, which may have led or tempted him to commit the offense' McAdory v. State, 62 Ala. 154 [(1878)]." Nickerson v. State, 205 Ala. 684, 685, 88 So. 905, 907 (1921).'"

"'Hatcher v. State, 646 So. 2d 676, 679 (Ala. 1994), quoting Bowden v. State, 538 So. 2d 1226, 1237 (Ala. 1988).

"'In determining whether evidence of a collateral act of sexual abuse is admissible to prove motive, the trial court must consider the following factors: "'(1) the offense(s) charged; (2) the circumstances surrounding the offense(s) charged and the collateral offense(s); (3) the other collateral evidence offered at trial; and (4) the other purpose(s) for which it is offered.'" Campbell v. State, 718 So. 2d 123, 130 (Ala. Crim. App. 1997), quoting Bowden, 538 So. 2d at 1237.'

"Proctor v. City of Prattville, 830 So. 2d 38, 41-42 (Ala. Crim. App. 2001). See also Garner v. State, 977 So. 2d 533 (Ala. Crim. App. 2007); Estes v. State, 776 So. 2d 206 (Ala. Crim. App. 1999). "

Williams, 389 So. 3d at 389-91.

Furthermore, in 1984 this Court, in Thomas v. State, 445 So. 2d 992 (Ala. Crim. App. 1984), held that evidence of a YO adjudication was admissible to rebut the defendant's testimony that he did not commit the offense now charged. We stated:

"We firmly adhere to the general rule that a youthful offender adjudication cannot be used for impeachment

48

purposes. We find, however, a significant distinction between using adjudication as a youthful offender to impeach credibility (which is not permitted because an adjudication is not a conviction, <u>Alderson v. State</u>, 370 So. 2d 1119, 1122 (Ala. Cr. App. 1979)), and using a guilty plea as a youthful offender for an offense to contradict the witness's testimony that he did not commit that offense.

"While the Youthful Offender Act is for the protection of the accused, the act cannot be perverted to allow an accused to enter a guilty plea to an offense and then, in a separate but related proceeding against a co-defendant, deny his participation in that same offense. Cf. <u>United States ex rel. Rohrlich v. Fay</u>, 240 F. Supp. 848 (S.D.N.Y. 1965) (where court noted that the New York Youthful Offender Act, which is very similar to the Alabama Youthful Offender Act, would not permit a witness who had been previously adjudged a youthful offender to be 'vouched for to a jury as a saint when in fact he is a sinner'). Under the circumstances of this case, we think that the State's policy interest in protecting the confidentiality of a youthful offender's record must yield to the public's right to the integrity of the judicial system."

445 So. 2d at 994-95.

In <u>Cooley v. State</u>, 686 So. 2d 546 (Ala. Crim. App. 1996), this Court reaffirmed our holding in <u>Thomas</u> and held that evidence of a YO adjudication was admissible to show that the appellant was "predisposed to sell controlled substances." 686 So. 2d at 546. We stated:

"This court's ruling in <u>Thomas [v. State</u>, 445 So. 2d 992 (Ala. Crim. App. 1984)], as quoted above, is controlling here. The admission of this evidence to show the predisposition of the [defendant] was not error. The evidence went towards establishing the [defendant's] state of mind, i.e., his

49

predisposition to sell drugs, and towards rebutting his testimony that he had never sold drugs before. The admission of the evidence did not violate the traditional rules of evidence. As the United States Supreme Court noted in Sorrells [v. United States, 287 U.S. 435 (1932)], the state's inquiry into the conduct of an accused who has raised an entrapment defense is 'searching.'"

686 So. 2d at 551.

This Court has also modified our prior decisions that excluded evidence of YO adjudications for impeachment purposes. In Saunders v. State, 10 So. 3d 53 (Ala. Crim. App. 2007), we noted that, although evidence of YO adjudications is typically not admissible for impeachment, a defendant may open the door to it admission.

> "Although youthful-offender adjudications are generally not admissible, a defendant can open the door in his direct testimony and render a youthful-offender adjudication admissible in cross-examination or on rebuttal. See, e.g., Williams v. State, 695 So. 2d 644 (Ala. Crim. App. 1996) ('[T]he appellant 'opened the door' for the admission of his prior juvenile adjudications by denying that he had ever been involved in anything similar to the offense for which he was charged.'), and Thomas v. State, 445 So. 2d 992 (Ala. Crim. App. 1984) (holding that although a youthful-offender adjudication may not be used to impeach credibility, when the witness opens the door by denying his criminal intent in a case, his prior youthful-offender plea of guilty to the same offense is admissible). Thus, the trial court correctly ruled that if Saunders testified that he had never been in any trouble before, then the prosecutor would be permitted to cross-examine Saunders about the prior youthful-offender adjudication."

50

10 So. 3d at 88.

Contrary to Perez's arguments on appeal, what the above cases clearly show is that Alabama appellate court have not automatically barred the admission of evidence of YO adjudications but, instead, Alabama appellate courts have held that its admission is dependent on the specific facts in each case.

More recently, the Alabama Supreme Court reversed this Court's decision affirming the admission of a evidence of YO adjudication because, it held, it was not relevant to the defendant's claim of self-defense or, more specifically, the issue of standing one's ground. See Ex parte Walton, [Ms. SC-2024-0862, Aug. 29, 2025] ___ So. 3d ___ (Ala. 2025). That Court stated:

"Rule 404(b)(1) provides that evidence of a person's other crimes, wrongs, or acts cannot be admitted 'to prove the character of a person in order to show action in conformity therewith.' Such evidence can, however, be considered for 'other purposes.' Rule 404(b)(2). Of course, if the evidence is offered for 'other purposes,' it still must be 'relevant' to be admissible. Rule 402, Ala. R. Evid. '"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' Rule 401, Ala. R. Evid. Even if technically relevant, evidence of prior crimes should not be admitted if its probative value does not outweigh its prejudicial effects:

"'"Judicial inquiry does not end with a determination that the evidence of another crime is relevant and probative of a necessary element of the charged offense. It does not suffice simply to see if the evidence is capable of being fitted within an exception to the rule. Rather, a balancing test must be applied. The evidence of another similar crime must not only be relevant, it must also be reasonably necessary to the government's case, and it must be plain, clear, and conclusive, before its probative value will be held to outweigh its potential prejudicial effects."'

"Averette v. State, 469 So. 2d 1371, 1374 (Ala. Crim. App. 1985) (quoting United States v. Turquitt, 557 F.2d 464, 468-69 (5th Cir. 1977)).

"It is doubtful whether evidence of Walton's prior crimes was relevant at all, because that evidence did not seem to prove 'any fact that is of consequence' to the resolution of the reckless-manslaughter case. Rule 401. The only issue that has been identified as possibly being affected by the fact that Walton had committed prior crimes was whether he was acting unlawfully, and therefore had a duty to retreat, when he allegedly shot Champion. But the duty to retreat simply was not an issue for the jury in this case. The concept of the right to stand one's ground was mentioned to potential jurors during voir dire, but, as Judge Cole noted in his dissent below, Walton's counsel stated during voir dire only that '"[t]his is a stand your ground state, meaning you don't even have to run, you can stand your ground; okay? Anybody got a problem with that? Anybody got a problem with the right to defend yourself, to defend yourself with a gun?"' Walton v. State, [CR-2022-1342, Aug. 23, 2024] ___ So. 3d ___, ___ [(Ala. Crim. App. 2024)] (Cole, J., dissenting). Walton's counsel made no mention of stand-your-ground principles during opening statements or the remainder of the trial. And Walton

52

specifically disavowed any intent to rely on a stand-your-ground defense. Indeed, consistent with that position, the trial court refused to instruct the jury on stand-your-ground principles and specifically instructed the jury that Walton had a duty to retreat. Such an instruction seems to confirm that evidence of Walton's prior crimes and the resulting firearm ban was simply irrelevant to the issues submitted to the jury. We can find nothing to justify the admission of any evidence of Walton's prior crimes because his illegal possession of the gun was directly conceded by the defense and indirectly accepted by the judge's instructions to the jury."

Walton, ___ So. 3d at ___.

Factually, this case and Walton are distinguishable. This case involves a capital-murder conviction that required the State to prove that Perez had the specific intent to kill Off. Tuder. In Walton, the defendant was originally indicted for murder and was convicted of reckless manslaughter. The sole basis in Walton for the admission of evidence of the prior YO adjudication was that it was relevant to the issue of a duty to retreat. However, the Supreme Court found that this was not an issue at trial and that, thus, the evidence of the prior YO adjudication was not relevant. Perez claimed that he feared for his life and that he shot and killed Off. Tuder in self-defense. Evidence of the prior YO adjudications was relevant to rebut this claim and show that Perez did not fear for his

life but had a motive to kill that was distinct from his claim of self-defense. Therefore, Walton is factually distinguishable from this case.

Here, the State argues that evidence of Perez's YO adjudications were relevant to show Perez's motive "to evade arrest and avoid returning to jail for violating his probation." (State's brief at p. 33.) Given that Perez claimed self-defense, the State had a heavier burden than in a typical case.

> "Once the issue of self-defense is raised, the State 'must prove that the accused did not act in self-defense in the sense that the State must prove a prima facie case of unjustified homicide.' Mack v. State, 348 So. 2d 524, 529 (Ala. Cr. App. 1977). That is, the State continues to have the burden of proving all of the elements of murder and must counter any evidence presented by the defendant which would raise a reasonable doubt as to the existence of one of these elements. Townsend v. State, 402 So. 2d 1097 (Ala. Cr. App. 1981). See also, Vaughn v. State, 293 Ala. 365, 304 So. 2d 6 (1974). The weight and credibility of that evidence is a question for the jury. Mack, supra."

Ex parte Johnson, 433 So. 2d 479, 481 (Ala. 1983).

The Texas Court of Criminal Appeals has noted that, once a defendant claims self-defense, the defendant makes motive an issue.

> "The appellant testified to self-defense and that she had no intent to kill. She wanted the jury to believe her testimony. The State was authorized to show that she shot another man sometime later to show her intent which tended to disprove her testimony. Appellant cites Lolmaugh v. State, 514 S.W.2d

54

758 (Tex. Cr. App. 1974). Lolmaugh shot and killed his wife's lover. The appellant claimed self-defense. This Court held that a part of his confession in which he admitted to a prior shooting of a man who had been his wife's lover was admissible. <u>When the appellant raised the issue of self-defense, motive became an issue</u>. The prior shooting tended to show Lolmaugh's state of mind at the time he committed the offense for which he was charged.

"In <u>Lolmaugh</u> there was the additional fact of the motive of the defendant. The fact that <u>Lolmaugh</u> is a stronger case for the admission of the extraneous offense does not make the testimony in the present case inadmissible."

<u>Halliburton v. State</u>, 528 S.W.2d 216, 218 (Tex. Crim. App. 1975) (emphasis added). See also <u>Render v. State</u>, 347 S.W.3d 905 (Tex. Ct. App. 2011). We agree with the circuit court that, given the facts of this case, the fact that Perez was on probation for YO adjudications was relevant and admissible to show his motive at the time that he fired the fatal shots.

Also, the circuit court gave very detailed jury instructions on the use of this evidence. In fact, each time this type of evidence was presented, the circuit court gave a limiting instruction on the use of this evidence and told the jury that it was only admissible to show Perez's motive. "Jurors are presumed to follow the court's instructions." <u>Thompson v. State</u>, 153 So. 3d 84, 171 (Ala. Crim. App. 2012).

Alternatively, the State argues that this evidence was admissible because it was part of the res gestae and "part of the chain or sequence of events which became part of the history of the case and formed part of the natural development of the facts." (State's brief at p. 31.) We agree with the State and the circuit court that the fact that Perez was on probation was a necessary factor to complete the story of why Perez was on the run from police and why Off. Tuder was actively seeking to locate him.[16]

The probative value of the evidence outweighed any possible prejudice. See Rule 403, Ala. R. Evid. Indeed, the circuit court, in an effort to minimize the impact of the evidence of prior YO adjudications ruled that only the fact that Perez was on probation was admissible and that the crimes for which he was adjudicated that resulted in that probation were not to be mentioned at trial. (R. 3651.)

For the foregoing reasons, we find that the circuit court did not abuse its discretion in allowing evidence that Perez was on probation

---

[16]This exception to the exclusionary rule is discussed in more detail in Part V of this opinion.

56

from YO adjudications at the time that he shot and killed Off. Tuder. Accordingly, Perez is due no relief on this claim.

V.

Perez next argues that the circuit court erred in not excluding highly irrelevant and prejudicial prior-act evidence under Rule 404(b), Ala. R. Evid. Specifically, he argues that the circuit court erred in allowing the State to present evidence indicating that he stole three different cars, broke into a fourth car, and stole a .40 caliber pistol from that fourth car in the 10-day period from January 9 to January 18, 2019, immediately before Off. Tuder was shot and killed on January 20. Perez says that the offenses were not relevant, were not connected to each other, and evidence of them was too prejudicial to be admitted.

The record shows that Perez moved in limine to prevent the State from referencing the five property crimes because, he argued, admission evidence of those crimes would violate Rule 404(b), Ala. R. Evid. After a hearing, the circuit court ruled that evidence of the crimes was admissible to prove Perez's motive. The circuit court stated:

"It shows the sequence of events in a very close proximate amount of time, within two weeks of the shooting, what he was doing, why he was acting the way he was to try to avoid capture -- trying to evade capture, to try to resist arrest, to try

57

to run, whatever he was doing, all of these things contributed, they say -- I'm not saying -- they say contributed to the event that happened on the on the terrible day. That's what they say."

(R. 3625-26.) After more argument, the circuit court concluded: "And so the State can argue them. Now, the State -- they're not automatically in evidence by virtue of my ruling." (R. R. 3637.) Based on the circuit court's comments, it is clear that the circuit court's pretrial ruling was not a final ruling. (R. 3637.) When a pretrial ruling is conditional, the defendant must object when the evidence is admitted to properly preserve that issue for appellate review. See Phillips, supra.

The record further shows that the first witness, Sgt. Owens, testified that the gun used by Perez in the shooting was traced back to a gun that had been stolen out of a vehicle. (R. 3800.) No objection was made. Charles Petty testified that, on January 20, 2019, he owned an F-150 truck and that, after he heard about the shooting at the Peach Place Apartments, a location not far from his house, he went to his truck to see if his firearm was still in his vehicle. (R. 3864.) He reported that his gun had been stolen, and Sgt. Owens contacted him. (R. 3866.) Perez did not object that this evidence violated Rule 404(b). Kaitlyn Davis testified that on January 9, 2019, her 2013 Honda Accord was stolen

58

when it was parked on the street in front of a friend's house. Perez did not object to this testimony. Davis further testified that her car was recovered about a week later, that the car had been trashed, and that all of the tires were popped. (R. 5141.) Perez's only objection was that this evidence was not relevant. Cpl. Russell Benefield of the Mobile County Sheriff's Office testified that, after fingerprints were collected from a receipt found in a stolen Honda vehicle, those prints were matched to Perez. (R. 5180.) Perez did not object to this testimony. Howard Cassidy testified that he was a friend of Perez's and that, around December 18, 2018, he saw Perez, that Perez had a gun, and that he told Cassidy that that gun had been stolen. (R. 4042.) Perez made no objection that this evidence violated Rule 404(b). Bradley Hudson with the Mobile Police Department testified that he issued a BOLO for a 2009 Lincoln MKX because the vehicle had been reported stolen. Defense counsel stated: "Judge, of course, we had previously made objections about the entire subject matter. Without waiving those, we have no objection to this." (R. 5285.) The circuit court then gave a detailed limiting instruction on the use of the evidence. (R. 5287.)

59

First, the State argues that the five property crimes were admissible to prove Perez's motive because Perez claimed self-defense and the State had to prove that Perez's actions were intentional.

> "'[T]estimony offered for the purpose of showing motive is always admissible. McClendon v. State, 243 Ala. 218, 8 So. 2d 883 (1942). Accord, Donahoo v. State, 505 So.2d 1067 (Ala. Cr. App. 1986). "'It is permissible in every criminal case to show that there was an influence, an inducement, operating on the accused, which may have led or tempted him to commit the offense.' McAdory v. State, 62 Ala. 154 [(1878)]." Nickerson v. State, 205 Ala. 684, 685, 88 So. 905, 907 (1921).'"

Hatcher v. State, 646 So. 2d 676, 679 (Ala. 1994) quoting Bowden v. State, 538 So. 2d 1226, 1235 (Ala. 1988)). We agree with the circuit court that this evidence was admissible to show Perez's motive to kill Off. Tuder. (See our discussion in Part IV of this opinion.)

Second, the State argues that evidence of the property crimes was admissible to tell the complete story of Perez's actions during the 10-day crime spree that culminated in Off. Tuder's death, and thus, that they were admissible under the res gestae or complete-story exception to the exclusionary rule. As this Court discussed in Doster v. State, 72 So. 3d 50 (Ala. Crim. App. 2010):

> "'[One such] "special circumstance" where evidence of other crimes may be relevant and admissible is where such evidence was part of the

chain or sequence of events which became part of the history of the case and formed part of the natural development of the facts. Commonwealth v. Murphy, 346 Pa. Super. 438, 499 A.2d 1080, 1082 (1985), quoting Commonwealth v. Williams, 307 Pa. 134, 148, 160 A. 602, 607 (1932). This special circumstance, sometimes referred to as the "res gestae" exception to the general proscription against evidence of other crimes, is also known as the complete story rationale, i.e., evidence of other criminal acts is admissible "to complete the story of the crime on trial by proving its immediate context of happenings near in time and place."'

"Commonwealth v. Lark, 518 Pa. 290, 303, 543 A.2d 491, 497 (1988). Evidence of a defendant's criminal actions during the course of a crime spree is admissible. See Phinizee v. State, 983 So. 2d 322, 330 (Miss. App. 2007) ('Evidence of prior bad acts is admissible to "[t]ell the complete story so as not to confuse the jury."'); Commonwealth v. Robinson, 581 Pa. 154, 216, 864 A.2d 460, 497 (2004) ('The initial assault on Sam-Cali took place approximately two weeks before the Fortney homicide and Sam-Cali's testimony provided the jury with a "complete story" of Appellant's criminal spree from the Burghardt homicide in August of 1992 to Appellant's capture in July of 1993.'); St. Clair v. Commonwealth, 140 S.W.3d 510, 535 (Ky. 2004) ('Here, the trial court properly permitted the Commonwealth to introduce evidence of Appellant's prior crimes and bad acts that were part of a continuous course of conduct in the form of a "crime spree" that began with Appellant's escape from an Oklahoma jail and ended with his flight from Trooper Bennett.'); People v. Sholl, 453 Mich. 730, 556 N.W.2d 851 (1996) ('"Evidence of other acts is admissible when so blended or connected with the crime of which defendant is accused that proof of one incidentally involves the other or explains the circumstances of the crime."'); State v. Charo, 156 Ariz. 561, 565, 754 P.2d 288, 292 (1988) ('"The 'complete story' exception to the rule excluding evidence of

prior bad acts holds that evidence of other criminal acts is admissible when so connected with the crime of which defendant is accused that proof of one incidentally involves the other or explains the circumstances of the crime." '); <u>State v. Long</u>, 195 Or. 81, 112, 244 P.2d 1033, 1047 (1952) ('It is fundamental that the state is entitled to the benefit of any evidence which is relevant to the issue, even though it concerns the commission of the collateral crimes. If evidence of a collateral crime tends to prove the commission of the crime charged in the indictment, the general rule of exclusion has no application.'); <u>State v. Schoen</u>, 34 Or. App. 105, 109, 578 P.2d 420, 422 (1978) ('The evidence, therefore, was relevant to complete the story of the crime charged.... The state is not required to "sanitize" its evidence by deleting background information to the point that the evidence actually presented seems improbable or incredible.').

"As we stated in <u>Cothren v. State</u>, 705 So. 2d 849 (Ala. Crim. App. 1997):

"'We agree with the trial court's ruling in receiving evidence of collateral offenses under the above exceptions. "The two crimes are intertwined and connected to such an extent that they form one continuous transaction." <u>Bush [v. State]</u>, 695 So. 2d [70,] 86 [(Ala. Crim. App. 1995)]. C. Gamble, <u>McElroy's Alabama Evidence</u>, § 70.01(12)(b) (5th ed.1996), in regard to the res gestae exception, states, "The prosecution may prove the accused's commission of collateral crimes, wrongs or acts if the evidence warrants a reasonable inference that such other crime was a part of the same transaction as the now-charged homicide."

"'The appellant's foremost argument regarding this issue does not dispute the exceptions to the general exclusionary rule, but rather, argues that the 'common plan or scheme'

62

exception does not apply to this particular capital offense. Specifically, he argues that because 12 hours had elapsed between the two murders, the act could not be part of one "common plan or scheme." We disagree.

"'In Ex parte Windsor, 683 So. 2d 1042, 1053 (Ala. 1996), the Alabama Supreme Court stated:

"'"The robbery and murder of Rayford Howard and the robbery and murder of Randall Earl Pepper occurred only hours apart, on the same day. Both victims were convenience store owners, and the crimes were factually similar. Therefore, the trial court did not err in admitting evidence regarding Windsor's participation in the robbery and murder of Randall Earl Pepper."

"'See also Guthrie v. State, 616 So. 2d 914 (Ala. Cr. App. 1993).

"'The Alabama Supreme Court in Windsor created no time limitation. The facts of this case clearly establish that the collateral capital offenses were part of a continuous crime spree.'

"705 So. 2d at 859-60.

"Clearly, evidence of the collateral crimes that were committed during the two-week crime spree was correctly received into evidence in order to tell the complete story of the actions of Doster and his codefendant from the time they escaped from the Covington County jail on November 4, 2002, until they were eventually apprehended in Texas on November 18, 2002. The collateral offenses explained how

63

> Doster and Phillips came to be in possession of the murder weapon, how they obtained the clothes they were wearing when they were arrested, how they obtained certain other items that were discovered in the truck, and the extent of their efforts to elude police after their escape from the Covington County jail."

Doster, 72 So. 3d at 88-89. See Thompson v. State, 153 So. 3d 84, 136-37 (Ala. Crim. App. 2012). Other courts agree with our holding in Doster. See Mosley v. State, 307 Ga. 711, 715, 838 S.E.2d 289, 296 (2020) ("[T]he evidence suggests that [LaQuan] Brown and [Rashad] Mosley engaged in a week-long crime spree. The burglary of [Prince] Owens 'was a link in the chain of events leading up to [Carter's] murder."); United States v. McLean, 138 F.3d 1398, 1403 (11th Cir. 1998) quoting United States v. Williford, 764 F.2d 1493, 1499 (11th Cir. 1985)) ("'Evidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive and set-up of the crime, is properly admitted if it is linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury.'").

In this section of Perez's brief, he also argues that, because these property charges were severed from his capital-murder charge, that fact alone showed that evidence of the property crimes should not have been

admitted pursuant to Rule 404(b). When granting Perez's motion to sever the charges, the circuit court specifically stated:

> "Upon consideration of the totality of the facts and circumstances presented, and the record before this Circuit Court, the Court finds that the non-capital offenses are not of a 'same or similar character' to the capital offense and the non-capital offenses do not have a 'general likeness' to the capital offense. This Court further finds that while there are connections between the alleged commission of the capital offense and the non-capital offenses, those connections are limited and are not sufficient alone to prevent severance or to justify consolidation under Rule 13.4, [Ala. R. Crim. P.] The Court also finds that the non-capital offenses share no common characteristics with the capital offenses. Further, even assuming for purposes of analysis that certain evidence of the non-capital offenses would be admissible for 404(b) or other purposes at the trial of the capital offense, that factor alone is not sufficient to prevent severance."

(Suppl. C. 583.)

The crime-spree evidence was relevant to show why the Mobile Police Department Gang Unit was actively pursuing Perez and why Off. Tuder was at the location where he ultimately confronted Perez. It was admissible to show the lengths that Perez resorted to in order to avoid arrest. Also, the testimony that Perez stole a pistol was relevant to show how Perez came to be in possession of the gun that he used to kill Off. Tuder. We agree that the crimes committed in the 10-day period after Perez left his parent's home and was actively evading police and in

65

violation of his probation were necessary to complete the story of the escalating events that resulted in Off. Tuder's death.

In <u>Hosch v. State</u>, 155 So. 3d 1048 (Ala. Crim. App. 2013), this Court held that if Rule 404(b) evidence is admitted under the res gestae exception no limiting instruction is necessary.

> "Other jurisdictions that have considered this issue have concluded that a limiting instruction is not required when evidence of other crimes or prior bad acts is properly admitted as part of the res gestae of the crime with which the defendant is charged. See <u>People v. Coney</u>, 98 P.3d 930 (Colo. Ct. App. 2004) (holding that evidence of other offenses or acts that are part and parcel of the charged offense is admissible as res gestae and may be admitted without a limiting instruction); <u>State v. Long</u>, 173 N.J. 138, 171, 801 A.2d 221, 242 (2002) (evidence of the defendant's actions 'served to paint a complete picture of the relevant criminal transaction' and therefore was admissible, and a limiting instruction was unnecessary because the evidence was admitted under the res gestae exception); and <u>Camacho v. State</u>, 864 S.W.2d 524, 535 (Tex. Crim. App. 1993) (holding the evidence of the extraneous offenses showed the context in which the criminal act occurred, i.e., the res gestae, and was therefore admissible and not subject to the requirement of a limiting instruction)."

155 So. 3d at 1084.

Moreover, we agree with the circuit court that the probative value of the evidence outweighed its prejudicial effect. See Rule 403, Ala. R. Evid. The property crimes were a vital part of the story of Perez's actions and reflected the extent that Perez was willing to go to evade police. They

66

were also admissible to establish Perez's motive to kill Off. Tuder. The circuit court did not abuse its discretion in allowing this evidence to be admitted. Therefore, Perez is due no relief on this claim.

## VI.

Perez next argues that the circuit court improperly allowed a State witness, Det. Jermaine Rogers, to narrate the presentation of still photographs that had been taken from a video of the confrontation between Perez and Off. Tuder. He argues that Det. Rogers's testimony violated Rules 602 and 701, Ala. R. Evid.,[17] because he had no personal knowledge of what occurred on the video or still photographs. (This evidence was admitted as State's Exhibit number 6.) Specifically, he argues that Det. Rogers should not have been allowed to narrate the

---

[17]Rule 602, Ala. R. Evid., states: "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness's own testimony. This rule is subject to the provisions of Rule 703 [Ala. R. Evid.,] relating to opinion testimony by expert witnesses."

Rule 701, Ala. R. Evid., states: "If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

presentation of the photographs because his comments implied that Perez should have known that Off. Tuder was a police officer. As stated previously, Perez argued that he had acted in self-defense in shooting Off. Tuder and that he did not know that he was a police officer.

The State first asserts that this issue is not properly preserved because, when this testimony was presented, Perez's only objection was the following: "Judge, I'm going to have to object to narration. I mean, it speaks for itself. We don't have to have the witness to tell the jury what's going on in the picture." (R. 5098.) The circuit court overruled the objection and explained: "Just for the record, the reason the Court's allowing it, this is an examination of a witness who's one of the investigating detectives and the jury is seeing what's going on at the same time. He's not just narrating without a picture being up there." (R. 5099.) Perez did not make the argument at trial that he now makes in his brief on appeal. Thus, we review this claim for plain error. See Rule 45A, Ala. R. App. P.

The State further argues that "Det. Rogers merely identified individuals and items shown in the still images; he did not offer any opinion or provide inferences beyond what was captured." (State's brief

at p. 49.) Perez suggests that Det. Rogers told the jury that there was evidence that showed that Off. Tuder's police badge was clearly visible when he opened his car door. However, our review of the record does not support Perez's assertions. Det. Rogers identified individuals on still images made from the video of the shooting and identified the location of Off. Tuder's gun and the location of his badge on his person. Also, like defense counsel stated in the quote above, the video speaks for itself. The circuit court did not abuse its discretion in allowing Det. Rogers to make comments on the photographs. Accordingly, Perez is due no relief on this claim.

## VII.

Perez next argues that the circuit court erred in allowing the State to admit evidence indicating that Perez had falsely reported that he had been kidnapped, that his parents had reported to police that he was missing, and that the false allegations had resulted in his being convicted of a misdemeanor offense.

The record shows that Perez filed a motion to exclude this evidence. At a pretrial hearing, this issue was discussed. (R. 3550-54.) Six months after Off. Tuder was shot, Perez pleaded guilty to making a false

statement to police by reporting a fake kidnapping. (R. 3542.) The State asserted that it intended to present evidence that Perez had pleaded guilty to that charge and "reported the kidnapping to avoid law enforcement." (R. 3543.) It asserted that such evidence was admissible to give "a complete picture to the jury about the events surrounding" the shooting, that it was admissible to show motive, and that it was relevant to Perez's state of mind because self-defense was raised in the case. (R. 3548.) Perez argued that this evidence would inflame the jury and "make him look like a bad guy" and that its prejudice outweighed its probative value. (R. 3542.) The following occurred:

> "[Prosecutor]: The kidnapping is the catalyst that got all of this started. Had he not faked his kidnapping, and had he gone to his federal probation officer on the 8th, we wouldn't be here.
>
> "[Defense counsel]: I think the 'and' part -- maybe the second half of the 'and.' But this didn't get started because he faked a kidnapping. It started because he didn't show up in Federal Court.
>
> "THE COURT: So the definition of relevant evidence. Relevant evidence means, quote, evidence having any tendency -- that's the first part -- to make the existence of any fact that is of consequence. That's materiality, a fact of consequence -- to the determination of the act more probable or less. That's probative. Is it probative or not -- then it would be without the evidence.

70

"So relevant evidence means -- I'm going to read it all together now -- evidence meaning -- evidence having any tendency -- any tendency -- to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence.

"I have to find that this is relevant. I have to find it's relevant because it bears directly on his motive and why he acted the way he did on the day of the shooting.

"Now, the question is whether the remoteness of it, you know, if I consider materiality and probative value. It meets the relevancy definition under [Rule] 401.

"You argue about remoteness of time. So the question there becomes a [Rule] 403[18] balancing issue, as I see it.

"And [Rule] 403 says, although relevant, evidence may be excluded. In other words, it can still be excluded if … its relevance if the probative value, that is, whether it's more probable or less, is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. And that's squarely what you're arguing.

"[Defense counsel]: Yes, sir.

"THE COURT: And it's [a] compelling argument -- or it's a good faith argument, I should say. It's a good faith argument.

"But, given that chronology and sequence of events, I do not find, as I do my trial judge discretion of weighing the

---

[18]Rule 403, Ala. R. Evid., states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

danger of unfair prejudice versus probative value, that is, I do not find that the danger of unfair prejudice substantially outweighs the probative value. I just can't find that, given the totality of the circumstances. So the Court's going to deny that motion in limine."

(R. 3552-54.) The ruling on this motion was a final ruling that preserved this issue for appeal. See Saunders v. State, 10 So. 3d 53, 87 (Ala. Crim. App. 2007).

Sgt. Owens testified that he assisted in the investigation of the kidnapping report that Perez's parents had made, based on text messages they had received from Perez's cellular telephone, on January 8, 2019; that, after an investigation, that report was determined to be false; and that as a result, an arrest warrant for making a false report was issued for Perez on January 9 or January 10. (R. 3794.) Municipal Court Judge Holmes Whiddon testified that, on July 23, 2019, Perez "appeared for a trial. A plea bargain was worked out, a negotiated plea, and I accepted his plea of guilty and imposed a sentence." (R. 3955.) At the plea hearing, Judge Whiddon said, Perez admitted that he made a false report to "avoid law enforcement." (R. 3966.)

After Judge Whiddon's testimony, the circuit court, ex mero motu, gave the following limiting instruction on the use of this evidence:

72

"I charge you that you may only consider that evidence as potentially bearing on the Defendant's motive at the time of the incident made the basis of the capital murder indictment.

"You may not consider that evidence as a basis to conclude that, on the date of the incident made the basis of the capital murder indictment, the Defendant acted in conformity with that alleged prior conduct, and may not consider that evidence as a basis to conclude that the Defendant committed the acts made the basis of the capital murder indictment."

(R. 3934-35.) A similar instruction was also given after Sgt. Owen's testimony.

Perez argues that evidence of the false report was not admissible for purposes of showing his motive, that it was not reasonably necessary to the State's case, and that it was unduly prejudicial. The State argues that this evidence was admissible for two reasons -- to show Perez's motive and to tell the complete story of the events leading up to Off. Tuder's murder. We agree that this evidence was admissible to show motive.

"'The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court's determination on that question will not be reversed except upon a clear showing of abuse of discretion.' Ex parte Loggins, 771 So. 2d 1093, 1103 (Ala. 2000). 'A trial court has wide discretion in determining whether to exclude or to admit evidence, and the trial court's determination on the

73

admissibility of evidence will not be reversed in the absence of an abuse of that discretion.' Woodward v. State, 123 So. 3d 989, 1014 (Ala. Crim. App. 2011). Additionally, '[t]rial courts are vested with considerable discretion in determining whether evidence is relevant, and such a determination will not be reversed absent plain error or an abuse of discretion.' Hayes v. State, 717 So. 2d 30, 36 (Ala. Crim. App. 1997)."

Floyd v. State, 289 So. 3d 337, 409 (Ala. Crim. App. 2017).

"Evidence tending to establish motive is always admissible. Perkins v. State, 808 So. 2d 1041, 1084 (Ala. Crim. App. 1999), aff'd, 808 So. 2d 1143 (Ala. 2001), vacated on other ground, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002). See also McElroy's Alabama Evidence § 70.01(12)(e). … 'If the prior bad act falls within [the motive] exception and is relevant and reasonably necessary to the State's case, and the evidence that the accused committed that act is clear and conclusive, it is admissible.' Boyd v. State, 715 So. 2d 825, 838 (Ala. Crim. App. 1997), aff'd, 715 So. 2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998)."

Irvin v. State, 940 So. 2d 331, 350 (Ala. Crim. App. 2005).

Moreover, the evidence was admissible to tell the complete story of the events that led to Off. Tuder's death.

"Evidence of the accused's commission of another crime or act is admissible if such other incident is inseparably connected with the now-charged crime. Such collateral misconduct has historically been admitted as falling within the res gestae of the crime for which the accused is being prosecuted. Most modern courts avoid use of the term 'res gestae' because of the difficulty in measuring its boundaries. The better descriptive expression is perhaps found in the requirement that the collateral act be contemporaneous with

74

the charged crime. This rule is often expressed in terms of the other crime and the now-charged crime being parts of one continuous transaction or one continuous criminal occurrence. This is believed to be the ground of admission intended when the courts speak in terms of admitting other acts to show the 'complete story' of the charged crime. The collateral acts must be viewed as an integral and natural part of the circumstances surrounding the commission of the charged crime."

Harris v. State, 2 So. 3d 880, 908 (Ala. Crim. App. 2007).

For these reasons, we find that the circuit court did not abuse its discretion in allowing the State to present evidence indicating that Perez was convicted of making a false report to police. Accordingly, Perez is due no relief on this claim.

## VIII.

Perez next argues that the circuit court erred in allowing the State to admit what, he says, were highly irrelevant and prejudicial photographs of Off. Tuder's body. Perez does not cite the specific exhibit numbers of the photographs he challenges on appeal, but he does list the page numbers of the record where copies of those photographs are contained.

The pages numbers cited by Perez correspond to State's Exhibits 291 through 307. (C. 434-50.) All of these exhibits are photographs that

show Off. Tuder's body after he had received medical treatment and after his death. State's Exhibits 291 through 295 are close-up photographs of Off. Tuder's head and upper body; State's Exhibit 296 is a full-body photograph; State's Exhibits 297 through 299 are close-up photographs of Off. Tuder's hand; State's Exhibit 300 through 302 are photographs of Off. Tuder's arm raised to show the trajectory of a bullet; State's Exhibit 303 is a photograph of Off. Tuder's back; and State's Exhibits 304 through 307 are close-up photographs that show no injuries but show the top of Off. Tuder's pants, with one showing a gun holster and one showing a set of handcuffs.

The record further shows that the photographs were admitted when former Lt. Joseph Rose of the Mobile Police Department testified that he went to Providence Hospital when he learned where Off. Tuder had been taken and that he took the photographs of Off. Tuder's body. (R. 4954-55.) When the State moved to admit State's Exhibits 290 through 313, defense counsel objected and stated: "No objection to 297. No objection to 298. No objection to 299. … No objection to 303. No objection to 304. I don't think we have an objection to the rest." (R. 4956.) Counsel specifically stated that he objected to State's Exhibits 291, 292, 293, 296,

76

300, and 302. (R. 4957.) He asserted that those photographs were "overly prejudicial" and not probative. The State asserted that the photographs of Off. Tuder were "needed to show the injuries." (R. 4958.) At the conclusion of the discussion, the circuit court stated:

> "They are very graphic in nature. And I do have to do the[Rule] 403 balancing. I'm very aware of the law governing these types of pictures and it's widely within the discretion of the Court. And I think all of the pictures have a probative value. I do not find that the probative value is substantially outweighed by the danger of prejudice or confusion of the issues. So I'm going to allow them all in."

(R. 4960.)

As this Court has stated:

> "Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. Chunn v. State, 339 So. 2d 1100, 1102 (Ala. Cr. App. 1976). To be admissible, the photographic material must be a true and accurate representation of the subject that it purports to represent. Mitchell v. State, 450 So. 2d 181, 184 (Ala. Cr. App. 1984). The admission of such evidence lies within the sound discretion of the trial court. Fletcher v. State, 291 Ala. 67, 277 So. 2d 882, 883 (1973); Donahoo v. State, 505 So. 2d 1067, 1071 (Ala. Cr. App. 1986) (videotape evidence). Photographs illustrating crime scenes have been admitted into evidence, as have photographs of victims and their wounds. E.g., Hill v. State, 516 So. 2d 876 (Ala. Cr. App. 1987). Furthermore, photographs that show the external

77

wounds of a deceased victim are admissible even though the evidence is gruesome and cumulative and relates to undisputed matters. E.g., Burton v. State, 521 So. 2d 91 (Ala. Cr. App. 1987). Finally, photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors. Hutto v. State, 465 So. 2d 1211, 1212 (Ala. Cr. App. 1984)."

Ex parte Siebert, 555 So. 2d 780, 783-84 (Ala. 1989). "The fact that a photograph is gruesome is not grounds to exclude it as long as the photograph sheds light on issues being tried." Ex parte Bankhead, 585 So. 2d 112, 118 (Ala. 1991). The circuit court did not abuse its considerable discretion in allowing the photographs to be admitted into evidence. For these reasons, Perez is due no relief on this claim.

IX.

Perez next argues that the circuit court erred in allowing the admission of an autopsy report and testimony from a doctor who did not perform the autopsy on Off. Tuder's body because, he says, the testimony and the report violated the Confrontation Clause and the United States Supreme Court's holding in Crawford v. Washington, 541 U.S. 36 (2004). Specifically, he argues that the autopsy report was testimonial in nature and that it was a violation of his right to confrontation to have someone who did not conduct the autopsy admit that report.

Dr. Frank Dunton testified that in 2019 he was employed by the Alabama Department of Forensic Sciences and that the autopsy on Off. Tuder's body had been conducted by Dr. Staci Turner. Dr. Turner was no longer employed at the department and had moved to another state, he said. (R. 5345.) Dr. Dunton testified to the procedures that are performed when conducting an autopsy, that he was the supervisor over death investigations, and that he had reviewed Dr. Turner's autopsy report and all other documentation that had been compiled during that autopsy. It was normal practice, he said, to review the results of other medical examiner's findings. (R. 5346.) Dr. Dunton testified that the autopsy performed in this case "conform[ed] to the standard autopsy protocols at the Department of Forensic Sciences." (R. 5346.) Off. Tuder had "eight separate wounds that were associated with gunshots" and died of those multiple gunshot wounds, Dr. Dunton said. (R. 5351.)

The record also shows that, when the State requested that Dr. Dunton be considered an expert in the field of forensic pathology, defense counsel specifically stated that he had no objection. (R. 5342.) Also, immediately before Dr. Dunton testified, the State moved to admit the autopsy report as State's Exhibit 347.

79

"[Prosecutor]: And State's exhibit 347, the autopsy report, Your Honor.

"THE COURT: Any objection?

"[Defense counsel]: No, sir.

"THE COURT: It's in without objection."

(R. 5339.) During Dr. Dunton's testimony, Perez did not object that his right to confrontation was being violated. Thus, we review this issue for plain error. See Rule 45A, Ala. R. App. P.

This Court has held that autopsy reports are not testimonial in nature and are admissible under the business-records exception to the hearsay rule.

"In Perkins v. State, 897 So. 2d 457 (Ala. Crim. App. 2004), we held that it was not a violation of the Confrontation Clause to admit an autopsy report without the medical examiner's testimony or testimony indicating that he or she was not available. We stated:

"'In Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court held that the admission of a wife's out-of-court statements to police officers, regarding an incident in which the defendant, her husband, allegedly stabbed the victim, violated the Confrontation Clause. The Supreme Court stated that an out-of-court statement by a witness that is testimonial is barred under the Confrontation Clause, unless the witness is unavailable and the defendant had a prior opportunity to cross-

80

examine the witness, regardless of whether such statement is deemed reliable by the trial court, abrogating its previous holding in Ohio v. Roberts[, 448 U.S. 56 (1980)]. While the Supreme Court applied a stricter standard to the admission of testimonial hearsay, however, it did not do so with regard to nontestimonial hearsay, noting:

> "'"Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law -- as does Roberts, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether."

"'541 U.S. at 68, 124 S.Ct. at 1374, 158 L.Ed.2d at 203.

"'Unlike the hearsay in Crawford v. Washington, the hearsay at issue in this case is nontestimonial in nature -- an autopsy report on the victim, Wysteria Mathews. As the Court noted in White [v. Illinois, 502 U.S. 346 (1992)]: "[w]here [the] proffered hearsay has sufficient guarantees of reliability to come within a firmly rooted exception to the hearsay rule, the Confrontation Clause is satisfied." 502 U.S. at 356.

"'Both Alabama and federal caselaw have recognized that the business records exception is a firmly rooted exception to the hearsay rule. See, e.g., McNabb v. State, 887 So.2d 929, 969 (Ala.Crim.App.2001); Ohio v. Roberts, 448 U.S. at 66 n. 8, 100 S.Ct. 2531. Moreover, under Alabama law, 'An autopsy report made in the regular course

of business is admissible under the business records exception.' 2 Charles W. Gamble, <u>McElroy's Alabama Evidence</u> § 254.01(18) (5th ed.1996) (footnote omitted). See also <u>Adams v. State</u>, 955 So. 2d 1037, 1072-73 (Ala. Crim. App. 2003); <u>Baker v. State</u>, 473 So. 2d 1127, 1129 (Ala. Crim. App. 1984). The results of Dr. Embry's autopsy and the supporting materials are business records, which bear the earmark of reliability or probability of trustworthiness and further the "'integrity of the fact-finding process,'" see <u>Coy v. Iowa</u>, 487 U.S. 1012, 1020, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988) (quoting <u>Kentucky v. Stincer</u>, 482 U.S. 730, 736, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987))....'

"897 So. 2d at 463-65. See <u>Gobble v. State</u>, 104 So. 3d 920 (Ala. Crim. App. 2010); <u>Sharifi v. State</u>, 993 So. 2d 907 (Ala. Crim. App. 2008). See also Annot., <u>Evidence -- Confrontation Clause -- Second Circuit Holds that Autopsy Reports are not Testimonial Evidence -- United States v. Feliz, 467 F.3d 227 (2d Cir. 2006),</u> 120 Harv. L. Rev. 1707, 1714 (2007). In Thompson's case, the admission of the autopsy reports, which were nontestimonial in nature, did not implicate the Confrontation Clause or <u>Crawford v. Washington</u>, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)."

<u>Thompson v. State</u>, 153 So. 3d 84, 128-29 (Ala. Crim. App. 2012). See also <u>Henderson v. State</u>, [Ms. CR-21-0044, May 3, 2024] ___ So. 3d ___ (Ala. Crim. App. 2024).

Moreover, Perez does not argue on appeal that the State failed to comply with Rule 803(6), Ala. R. Evid.[19]  Indeed, our review of the record shows that the State fully complied with this Rule.  Furthermore, the majority of the testimony that Perez cites was testimony based not on the autopsy report, but on Dr. Dunton's knowledge as an expert pathologist, specifically, the trajectory of bullets and the result of the injuries that Off. Tuder sustained as a result of those bullets.

Dr. Dunton's testimony concerning the cause of Off. Tuder's death did not constitute reversible error.

> "In addition, Dr. [Frank] Dunton, who was subject to cross-examination, testified as to the causes of the victims' deaths.  And, although Dr. Dunton referred to the causes of deaths set forth in Dr. [Kathleen] Enstice's autopsy reports, he did not merely recite her conclusions. Instead, Dr. Dunton testified that he had conducted an 'in-depth review' of 'the

---

[19]Rule 803(6), Ala. R. Evid., provides that the following are not excluded by the hearsay rule:

"A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), [Ala. R. Evid.,] or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness."

83

entire file,' including the autopsy photographs (R. 1622), and he provided his own expert opinions regarding the causes of death based on his personal review of the file. (R. 1635-36, 1647-48, 1663.) Thus, Dr. Dunton's testimony was cumulative to the information contained in the autopsy reports. See Gobble v. State, 104 So. 3d 920, 959 (Ala. Crim. App. 2010) ('"The erroneous admission of evidence that is merely cumulative is harmless error."' (quoting Dawson v. State, 675 So. 2d 897, 900 (Ala. Crim. App. 1995))); and Ex parte Phillips, 287 So. 3d 1179, 1209 (Ala. 2018) (holding that any Confrontation Clause violation that had occurred was rendered harmless by cumulative evidence)."

Henderson v. State, ___ So. 3d at ___.

Furthermore, if any error occurred, that error was harmless. The cause of Off. Tuder's death was not in dispute. Indeed, Perez said that he shot Off. Tuder but acted in self-defense.

"Regardless, as noted above, 'violations of the Confrontation Clause are subject to harmless-error analysis. Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986).' Smith [v. State], 898 So. 2d [907] at 917 [(Ala. Crim. App. 2004)]. As explained above, even if the trial court erred in admitting the results of the urine pregnancy test, that error would be, at worst, harmless because it was cumulative to Dr. Ward's testimony that she actually observed the 'products of conception' and to Phillips's statement to Investigator Turner. Accordingly, Phillips is due no relief as to this claim."

Phillips v. State, 287 So. 3d 1063, 1112 (Ala. Crim. App. 2015).

The circuit court did not abuse its discretion in allowing the autopsy report to be admitted into evidence and in allowing Dr. Dunton to testify

concerning the cause of Off. Tuder's death. Accordingly, Perez is due no relief on this claim.

X.

Perez next argues that his conviction should be reversed after the admission of victim-impact evidence in the guilt phase of his capital-murder trial because, he argues, that evidence was not relevant to any issue of guilt. Specifically, he argues that the State called Off. Tuder's wife, Kristen Tuder, and that she testified concerning "her experience on the day of her husband's death." (Perez's brief at p. 97.)

The record shows that Kristen was asked if her husband received a telephone call on the day he was shot. She testified that after the telephone call her husband got dressed, that he left in his "regular car," that she texted him, that he did not respond, that she started to worry, that she was informed of the shooting, and that she "freaked out." (R. 4632.) Perez made no objection during her testimony that her testimony constituted improper victim-impact testimony.

> "It is well settled that victim-impact statements '"are admissible during the guilt phase of a criminal trial only if the statements are relevant to a <u>material issue</u> of the guilt phase. Testimony that has no probative value on any material question of fact or inquiry is inadmissible."' <u>Ex parte Crymes</u>, 630 So. 2d 125, 126 (Ala.1993) (emphasis in original)."

85

<u>McCray v. State</u>, 88 So. 3d 1, 37 (Ala. Crim. App. 2010).

The State first argues that Kristen's testimony was not victim-impact evidence but that her testimony explained her husband's actions on the day of the shooting and was "relevant to prove the circumstances leading to the crime and to show that Off. Tuder was going to work when he left his house."  (State's brief at p. 78.)

> "This Court has explained that, to be victim-impact evidence, the evidence must '"'typically "describe <u>the effect</u> of the crime on the victim and his family."'"'  <u>Russell v. State</u>, 272 So. 3d 1134, 1162 (Ala. Crim. App. 2017) (quoting <u>Townes v. State</u>, 253 So. 3d 447, 474 (Ala. Crim. App. 2015) (opinion on return to remand), quoting in turn <u>Turner v. State</u>, 924 So. 2d 737, 770 (Ala. Crim. App. 2002), quoting in turn <u>Payne v. Tennessee</u>, 501 U.S. 808, 821, 111 S. Ct. 2597, 115 L.Ed. 2d 720 (1991)) (emphasis added).  If it does not describe the effect of the crime on the victim or the victim's family, then it is not victim-impact evidence."

<u>Brooks v. State</u>, 340 So. 3d 410, 463 (Ala. Crim. App. 2020).  We agree with the State's assessment of the evidence.

Moreover, in <u>Ex parte Rieber</u>, 663 So. 2d 999 (Ala. 1995), the Alabama Supreme Court held that the admission of victim-impact evidence in the guilt phase of a capital-murder trial may be harmless error.

"We agree with Rieber that Mr. Craig's [the victim's husband's] testimony concerning Ms. Craig's children, their ages, and the status of their custody after the murder was not relevant with respect to the question of his guilt or innocence and, therefore, that it was inadmissible in the guilt phase of the trial. The only issue before the jury during the guilt phase of the trial was whether Rieber had robbed and killed Ms. Craig. However, in Ex parte Crymes, 630 So. 2d 125 (Ala. 1993), a plurality of this Court held in a capital murder case in which the defendant was sentenced to life-imprisonment without parole that a judgment of conviction can be upheld if the record conclusively shows that the admission of the victim impact evidence during the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant. See, also, Giles v. State, 632 So. 2d 568 (Ala. Crim. App. 1992), aff'd, 632 So. 2d 577 (Ala. 1993), cert. denied, 512 U.S. 1213, 114 S.Ct. 2694, 129 L.Ed.2d 825 (1994); Ex parte Parker, 610 So.2d 1181 (Ala. 1992), cert. denied, 509 U.S. 929, 113 S.Ct. 3053, 125 L.Ed.2d 737 (1993); Lawhorn v. State, [581 So. 2d 1159 (Ala. Crim. App. 1990), aff'd, 581 So. 2d 1179 (Ala. 1991) ]; Hooks v. State, 534 So. 2d 329 (Ala. Crim. App. 1987), aff'd, 534 So. 2d 371 (Ala. 1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989); and Ex parte Whisenhant, [555 So. 2d 235 (Ala. 1989)], applying a harmless error analysis in death penalty cases. Our review of the record indicates that Rieber's attorneys did not object to Mr. Craig's brief references to Ms. Craig's children or ask him any questions on cross-examination. The trial court clearly instructed the jury that it had to determine, based on all of the evidence, whether Rieber had robbed and killed Ms. Craig. The jury was instructed that it could not find Rieber guilty unless the prosecutor had established his guilt beyond a reasonable doubt. The jury was also instructed not to let sympathy or prejudice affect its verdict. We caution prosecutors that the introduction of victim impact evidence during the guilt phase of a capital murder trial can result in reversible error if the record indicates that it probably distracted the jury and kept

87

it from performing its duty of determining the guilt or innocence of the defendant based on the admissible evidence and the applicable law. However, after examining the record in its entirety, we conclude that the aforementioned portions of Mr. Craig's testimony, although they should not have been permitted, did not operate to deny Rieber a fair trial. It is presumed that jurors do not leave their common sense at the courthouse door. It would elevate form over substance for us to hold, based on the record before us, that Rieber did not receive a fair trial simply because the jurors were told what they probably had already suspected -- that Ms. Craig was not a 'human island,' but a unique individual whose murder had inevitably had a profound impact on her children, spouse, parents, friends, or dependents (paraphrasing a portion of Justice Souter's opinion concurring in the judgment in Payne v. Tennessee, 501 U.S. 808, 838, 111 S.Ct. 2597, 2615, 115 L.Ed.2d 720 (1991))."

Ex parte Rieber, 663 So. 2d at 1005-06. This Court has repeatedly held that the admission of some victim-impact evidence at the guilt phase of a capital-murder trial does not constitute reversible error. See Ex parte Rieber, supra; Johnson v. State, [Ms. CR-2023-0911, Dec. 19, 2025] ___ So. 3d ___ (Ala. Crim. App. 2025); Keaton v. State, 375 So. 3d 44 (Ala. Crim. App. 2021); Campbell v. State, 241 So. 3d 749 (Ala. Crim. App. 2017); Wilson v. State, 142 So. 3d 732 (Ala. Crim. App. 2010). We agree with the State that if any of Kristen's testimony could be victim-impact evidence, its admission was harmless beyond a reasonable doubt. Accordingly, Perez is due no relief on this claim.

XI.

Perez next argues that the prosecutor repeatedly engaged in misconduct that denied him a fair trial. In his brief, he lists four different grounds to support this claim.

Perez did not object to all the now-challenged instances of prosecutorial misconduct. As this Court has noted:

> "'While this failure to object does not preclude review in a capital case, it does weigh against any claim of prejudice.' Ex parte Kennedy, 472 So. 2d [1106,] 1111 [(Ala. 1985)] …. 'This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.' Johnson v. Wainwright, 778 F.2d 623, 629 n.6 (11th Cir. 1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987)."

Kuenzel v. State, 577 So. 2d 474, 489 (Ala. Crim. App. 1990).

> "'Prosecutorial misconduct during closing arguments rarely constitutes plain error that requires reversal.' People v. Walters, 148 P.3d 331, 335 (Colo. App. 2006). '"[T]he impropriety of the argument must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting ex mero motu an argument which defense counsel apparently did not believe was prejudicial when he heard it." State v. Johnson, 298 N.C. 355, 369, 259 S.E.2d 752, 761 (1979).' State v. Gregory, 340 N.C. 365, 424, 459 S.E.2d 638, 672 (1995)."

Iervolino v. State, 402 So. 3d 844, 882 (Ala. Crim. App. 2023).

A.

Perez first argues that in the guilt-phase closing argument the prosecutor misrepresented the facts by referring to Perez as a "fleeing felon" who had been "convicted of multiple felonies." (Perez's brief at p. 99.) Perez asserts that he had prior adjudications as a youthful offender, and such adjudications, he says, are not felonies.

The record shows that, in the State's rebuttal closing argument, the prosecutor argued:

> "You might not like what [Off. Tuder] did out there that day, but he did what he thought he should do in a moment to get this criminal, the Defendant Marco Perez off the streets.
>
> "You might think he disregarded his own safety. But he was trying to protect everyone out there that day at Peach Place Apartments. He was trying to protect the community from this wanted fugitive, from a fleeing felon."

(R. 5786 (emphasis added).) Later in the same rebuttal argument, the prosecutor stated:

> "The Defendant was a dangerous person. He was convicted of multiple felonies. He was wanted by the Federal authorities. He was deliberately evading arrest by the police. He was armed and dangerous and he wasn't going back to jail. And that is when the public is most at risk."

(R. 5813 (emphasis added).) Perez made no objection to the prosecutor's argument; thus, we review this claim for plain error. See Rule 45A, Ala.

90

R. App. P. Perez's failure to object weighs against any claim of prejudice.

See <u>Iervolino v. State</u>, supra.

> "'In reviewing allegedly improper prosecutorial argument, we must first determine if the argument was, in fact, improper. If we determine that the argument was improper, the test for review is not whether the comments influenced the jury, but whether they might have influenced the jury in arriving at its verdict.' <u>Smith v. State</u>, 698 So. 2d 189, 202-03 (Ala. Cr. App. 1996), aff'd, 698 So. 2d 219 (Ala. 1997), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997) (citations omitted); <u>Bush v. State</u>, 695 So. 2d 70, 131 (Ala. Cr. App. 1995), aff'd, 695 So. 2d 138 (Ala. 1997), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997) (citations omitted). 'The relevant question is whether the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process."' <u>Darden v. Wainwright</u>, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986), quoting <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Comments made by the prosecutor must be evaluated in the context of the whole trial. <u>Duren v. State</u>, 590 So. 2d 360, 364 (Ala. Cr. App. 1990), aff'd, 590 So. 2d 369 (Ala. 1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992). 'Prosecutorial misconduct is subject to a harmless error analysis.' <u>Bush v. State</u>, 695 So. 2d at 131 (citations omitted); <u>Smith v. State</u>, 698 So. 2d at 203 (citations omitted)."

<u>Simmons v. State</u>, 797 So. 2d 1134, 1161-62 (Ala. Crim. App. 1999) (opinion on return to remand).

> "'The test of a legitimate argument is that whatever is based on facts in evidence is within the scope of proper comment and argument to the jury.' <u>Ward v. State</u>, 440 So. 2d 1227, 1230 (Ala. Cr. App. 1983). 'Counsel for both the State and [the] defendant are allowed wide latitude in drawing reasonable

inferences from the evidence in their closing arguments. A prosecutor as well as defense counsel has a right to present [her] impression from the evidence, if reasonable, and may argue every legitimate inference.' Manigan v. State, 402 So. 2d 1063, 1072 (Ala. Cr. App.), citations omitted, cert. denied, 402 So. 2d 1072 (Ala. 1981). 'A prosecutor may express her opinion concerning reasonable inferences, deductions, and conclusions to be drawn from the facts and evidence, as long as she does not express an opinion as to the defendant's guilt. Sams v. State, 506 So. 2d 1027, 1029 (Ala. Cr. App. 1986).' Cross v. State, 536 So. 2d 155, 160 (Ala. Cr. App. 1988)."

Wright v. State, 641 So. 2d 1274, 1282 (Ala. Crim. App. 1993).

Given that Perez did not object to this argument, we are confident that the prosecutor's argument did not so infect the "'trial with unfairness as to make the resulting conviction a denial of due process."' Simmons v. State, 797 So. 2d at 1162 (citation omitted). Accordingly, Perez is due no relief on this claim.

### B.

Perez next argues that the prosecutor hugged the victim's family members in the presence of the jury, thereby vouching and bolstering the testimony of Off. Tuder's family members.

The record shows that, after Sgt. Dorothea Long testified, the circuit court indicated that Perez's parents were in the courtroom and that they should not engage in any outbursts. The court then stated:

92

"I'm not going to allow the State in open court to be hugging or holding the hands of the victim's side in this case in front of the cameras, for the media, or the jury. I'm going to expect the same of the Defense. Because that is getting in the direction of vouching for personally the position of that party or that witness. This is very important. All right?

"I'm going to direct both sides, no hugging of their client or holding hands with their client or holding hands with their client's parents in front of the cameras or in front of the jury. I'm not going to have this kind of stuff."

(R. 3891.)

However, nothing in the record shows that the prosecutor did, in fact, hug any member of the victim's family. In fact, these comments by the circuit court were made after the State requested that it be allowed to treat Perez's parents as hostile witnesses and that the circuit court instruct his parents not to make any emotional outbursts. (R. 3883-84.) The circuit court asked that defense counsel talk with the Perezes. After a brief recess, the circuit court stated that it would consider the Perezes as hostile witnesses and that it would allow the prosecutor to ask leading questions. (R. 3886.) The record reflects that when Perez was being led back into the courtroom, he said "I can't do it, man," and a notation in the record states: "Defendant runs from courtroom because lockup area." (R. 3889.) Immediately after this exchange, the circuit court made comments

93

about physical displays in front of the jury. The circuit court also instructed the jury to disregard what happened in the courtroom as it had no bearing on the case. (R. 3893-94.) There is no indication in the record that the circuit court's comments were caused by the prosecutor hugging any member of the victim's family. We agree with the State that this allegation by Perez is not supported by the record.

> "This Court has repeatedly held that it will not find plain error based on a silent record, and an error must be obvious on the face of the record or it cannot rise to the level of plain error. E.g., Ex parte Walker, 972 So. 2d 737, 755 (Ala. 2007) ('Speculation from a silent record will not support a finding of prejudice.[']). Carroll v. State, 215 So. 3d 1135 (Ala. Crim. App. 2015), Woodward v. State, 123 So. 3d 989, 1006 (Ala. Crim. App. 2011)."

Henderson v. State, 248 So. 3d 992, 1042 (Ala. Crim. App. 2017). For these reasons, Perez is due no relief on this claim.

C.

Perez next argues that the prosecutor committed misconduct by expressing his personal views about whether Off. Tuder was on duty at the time of the shooting.

The record shows that, on recross-examination of Off. Blakely Miles, the following occurred:

94

"[Defense counsel]:   When you go on duty, you typically call in dispatch, right?

"[Prosecutor]:  No.

"[Defense counsel]:  Judge, I would object.  She is shaking her head no to this witness.

"[Prosecutor]:  I am.

"THE COURT:  Let's don't have -- and this applies to both sides.   No signs of exasperation or expressions of disagreement that might be interpreted wrongfully by a witness or the jury or anybody else."

(R. 4445.)   Based on the above, it appears that the circuit court agreed with Perez and instructed the attorneys not to show any expression of disagreement.   "An adverse ruling is a preliminary requirement to preservation of error for appellate review."  Trawick v. State, 431 So. 2d 574, 578 (Ala. Crim. App. 1983).  Perez argues that the circuit court did not instruct the jury to disregard the comment.  The record shows that defense counsel did not request that the circuit court instruct the jury to disregard the prosecutor's comment.   Nonetheless, the circuit court instructed the jury in its jury instructions that any comments or statements by the lawyers were not considered to be evidence.  (R. 5819.)

We agree with the State that the prosecutor's actions did not so infect the trial with unfairness that Perez was denied due process. We note that, during the redirect examination by the prosecutor, the prosecutor asked Off. Miles: "[P]olice can be on duty if they check in with their supervisor, can't they?" (R. 4443.) He responded yes. There was a basis in the record for the prosecutor's comment. For these reasons, we find that Perez is due no relief on this claim.

D.

Perez next argues that during closing argument the prosecutor made arguments that, he says, were irrelevant, not supported by the evidence, and served only to prejudice the jury when he argued: "[I]f self-defense applied in Perez's case, there could be no accountability for others who shoot police officers in the future." (Perez's brief at p. 101-102.)

Specifically, Perez challenges the following argument made in the prosecutor's closing argument in the guilt phase:

> "The judge will also instruct you on what's called provocation manslaughter. And we would have to prove the three elements, that Sean Tuder's dead, Defendant caused his death, he did it intentionally, and that the Defendant caused by provocation recognized by law and before a reasonable time for the passion to cool and for reason to reassert itself.

"And so they're going to want you to believe that this is some sort of he was acting in a sudden heat of passion.

"This isn't a sudden heat-of-passion situation. Under this logic, every single fugitive who has ever had a gun drawn on him by law enforcement could just shoot the police and say, oh, it's just sudden heat of passion manslaughter. There would be no accountability, no responsibility.

"If this situation is legal provocation, then I guess any future police officer that's attempting to effect a lawful arrest is just a free target to a suspect who can then claim later what they were provoked into shooting them."

(R. 5722.) Perez made no objection to this argument; thus we must review this claim of prejudice under our plain-error analysis. Rule 45A, Ala. R. App. P.

"[P]rosecutors are to be allowed a wide latitude in their exhortations to the jury. Varner v. State, 418 So. 2d 961 (Ala. Cr. App. 1982). 'Statements of counsel and argument must be viewed as in the heat of debate and must be valued at their true worth rather than as factors in the formation of the verdict.' Orr v. State, 462 So. 2d 1013, 1016 (Ala. Cr. App. 1984)."

Armstrong v. State, 516 So. 2d 806, 809 (Ala. Crim. App. 1986).

As we stated previously, the circuit court instructed the jury that arguments of counsel were not evidence. (R. 5819.) We cannot say that the prosecutor's comments resulted in reversible error. See Iervolino v. State, supra. Accordingly, Perez is due no relief on this claim.

97

<u>Penalty-Phase Issues</u>

XII.

Perez next argues that the circuit court improperly bolstered the testimony of the State's rebuttal expert, Dr. Jessica Kirk, when it stated that Dr. Kirk had previously been found to be an expert in its courtroom. He argues: "The trial judge's impermissible bolstering of Dr. Kirk's credibility rendered the jury's weighing process unreliable in the penalty phase." (Perez's brief at p. 71.)

The record shows that, during the penalty phase, Perez called Dr. Stephen Zieman, a licensed psychologist, to provide expert testimony about adolescent brain development. As previously stated, Perez was 19 years old at the time of the shooting. To rebut that testimony, the State called Dr. Kirk. The following occurred:

> "[Prosecutor]: I'll move to admit Dr. Kirk as an expert in the field of pediatrics.
>
> "THE COURT: Any objection?
>
> "[Defense counsel]: Yes, sir. This is the rebuttal witness as to the psychologist that testified. The qualifications she's announced are not applicable to the field to be testified to.
>
> "THE COURT: [Prosecutor] do you want to lay --
>
> "[Prosecutor]: I will.

"THE COURT: Let me just say. I know of the medical qualifications very well of Dr. Kirk. She's testified in my court many times as an expert on pediatric medicine areas. But I would give a little more predicate on the psychological, psychiatric training she might have relative to minors, or people under 21; people 19 and under."

(R. 6258.) Clearly, the circuit court agreed with Perez and stated that more predicate would have to be established regarding Dr. Kirk's psychological background before it would find her an expert.

The State relies on this Court's recent decision in Spencer v. State, [Ms. CR-2022-1280, Dec. 20, 2024] ___ So. 3d ___ (Ala. Crim. App. 2024), to support its argument that the circuit court's comments did not amount to reversible error. In Spencer, the trial court stated: "'They've done a really good job, and so have all the officers that have testified, a lot of experience. A lot of experiences, different people have testified, doctors, different folks. It's been some really interesting testimony, been presented in very interesting ways ....'" ___ So. 3d at ___.

"Spencer complains only about the emphasized portion of the court's comment above. However, '[t]he trial judge's statement to the jury must be viewed within the context of the entire charge.' McCovery [v. State], 365 So. 2d [358] at 362 [(Ala. Crim. App. 1978)]. '"[I]solated statements which appear prejudicial when taken out of context may be innocuous when viewed in light of the entire trial."' Id.

99

(citing <u>United States v. McCoy</u>, 539 F.2d 1050, 1063 (5th Cir. 1976)).

"Reading the judge's comment in the context of the court's entire charge in this case, there is no indication that the court meant his statement to bolster the State's case or the defendant's case. The trial judge's statement also did not appear to be an intentional comment on the evidence that had been presented, nor was the judge speaking to the issues presented at Spencer's trial. To the contrary, the record indicates that the court was merely explaining the trial process to the jury and, in doing so, commented on how the trial had been handled up until that point by all the witnesses and attorneys involved. Additionally, immediately before the statement to which Spencer now challenges, the judge had explained to the jury that the arguments of counsel were not to be considered evidence, and the judge also explained to the jury that the jury would be the finders of fact in this case. Considering the entirety of the trial judge's statement to the jury and the context with which the statement was made, there is nothing in the record to suggest that the statement affected the result of Spencer's trial, and, therefore, we find no error in the trial judge's comment to the jury. See <u>McCovery</u>, 365 So. 2d at 362."

<u>Spencer</u>, ___ So. 3d at ___.

"The law does not prohibit the trial judge from giving trial counsel his reasons in making certain rulings as to the law applicable to the case.... <u>Bedingfield v. State</u>, [47 Ala. App. 677, 681, 260 So. 2d 408, 412 (1972)].

"In 23 C.J.S., <u>Criminal Law</u> § 993, p. 1024, it is said, 'Generally, it is not improper to comment on the evidence for the judge to explain his ruling on a matter of law, and he may refer to testimony and state its legal effect, in deciding a point raised during the trial.'"

McDonald v. State, 340 So. 2d 80, 83 (Ala. Crim. App. 1976).

> "The fact that the trial court makes a brief personal remark to or about a witness does not necessarily improperly comment upon the credibility of the witness. O'Hara v. State, 241 Ga. App. 855, 859(3), 528 S.E.2d 296 (2000). Unquestionably, the trial court is authorized to control the conduct of the trial and to guide counsel to ensure a fair trial and the orderly administration of justice. Adams v. State, 282 Ga. App. 819, 824(4), 640 S.E.2d 329 (2006). 'While a court may not express an opinion as to what has or has not been proven, OCGA § 17-8-57, remarks made by the court regarding the admissibility of evidence or explaining the court's rulings are not such a comment or opinion. [Cits.]' (Citation and punctuation omitted.) Mitchell v. State, 275 Ga. 42, 44(4), 561 S.E.2d 803 (2002)."

Smith v. State, 292 Ga. 588, 589-90, 740 S.E.2d 129, 131-32 (2013).

"[W]e cannot agree with [the defendant] that the trial court undermined the integrity of the process or improperly enhanced the credibility of this witness by engaging in this brief, friendly exchange to which [the defendant] posed no objection." O'Hara v. State, 241 Ga. App. 855, 859, 528 S.E.2d 296, 300 (2000). Accordingly, Perez is due no relief on this claim.

## XIII.

Perez next argues that the jury's nonunanimous death verdict violates state and federal law. Specifically, he argues that Alabama's "sentencing scheme, permitting non-unanimous jury verdicts, violated

Perez's rights to a jury trial, a fair trial, to be free from cruel and unusual punishment, and due process under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Alabama law." (Perez's brief at p. 110.)

Here, the jury, by a vote of 11 to 1, sentenced Perez to death. (C. 13.) This Court has held that a nonunanimous verdict for death does not violate the United States Supreme Court's line of cases that started with Ring v. Arizona, 536 U.S. 584 (2002). As we stated in Keaton v. State, 375 So. 3d 44 (Ala. Crim. App. 2021):

> "Keaton argues that her death sentence is unconstitutional because the jury did not unanimously recommend the death penalty. However, '"Alabama law does not require that the jury's advisory verdict be unanimous before it can recommend death,"' Thompson [v. State], 153 So. 3d [84] at 179 [(Ala. Crim. App. 2012)] (quoting Miller v. State, 913 So. 2d 1148, 1169 n.4 (Ala. Crim. App. 2004)), and Keaton cites no case from the United States Supreme Court that requires such unanimity. See State v. Poole, 297 So. 3d 487, 504 (Fla. 2020), cert. denied 592 U.S. ___, 141 S. Ct. 1051, 208 L.Ed.2d 521 (2021) (holding that the 'requirement of a unanimous jury' for the imposition of the death penalty 'finds no support in' caselaw from the United States Supreme Court). See also Lane [v. State], 327 So. 3d [691] at 776-77 [(Ala. Crim. App. 2020)] (noting that '"both this Court and the Alabama Supreme Court have upheld death sentences imposed after the jury made a less-than-unanimous recommendation that the defendant be sentenced to death"' (quoting Brownfield v. State, 44 So. 3d 1, 39 (Ala. Crim. App. 2007))). Keaton's reliance on Ramos v. Louisiana, 590 U.S. 83, 140 S. Ct. 1390,

206 L.Ed.2d 583 (2020), is misplaced because <u>Ramos</u> held only that the United States Constitution requires a unanimous verdict to support a conviction, not a sentence. See <u>Ruiz v. Davis</u>, 819 F. App'x 238, 246 n.9 (5th Cir. 2020) (noting that the United States Supreme Court held in <u>Ramos</u> that '"the Sixth Amendment's right to a jury trial requires a unanimous verdict to support a conviction," not a sentence' (quoting <u>Ramos</u>, 590 U.S. at 93, 140 S. Ct. at 1397))."

<u>Keaton v. State</u>, 375 So. 3d at 136-37.

More recently, this Court reaffirmed that holding:

"Henderson argues that § 13A-5-46(f), Ala. Code 1975, [20] violates the Sixth Amendment because it allows a jury to recommend a death sentence by the votes of only 10 jurors, rather than requiring a unanimous vote. Specifically, Henderson argues that § 13A-5-46(f) 'can no longer stand in light of' the United States Supreme Court's decision in <u>Ramos v. Louisiana</u>, 590 U.S. 83, 140 S.Ct. 1390, 206 L.Ed.2d 583 (2020). However, this Court has already rejected that argument, noting that '<u>Ramos</u> held only that the United States Constitution requires a unanimous verdict to support a conviction, not a sentence.' <u>Keaton [v. State]</u>, 375 So. 3d [44] at 137 [(Ala. Crim. App. 2021)], cert. denied, ___ U.S. ___, 143 S. Ct. 2585, 216 L.Ed.2d 1195 (2023). Henderson also argues that § 13A-5-46(f) violates the Eighth Amendment to the United States Constitution, but he cites no authority that supports that argument. We also note that § 13A-5-46(f) has

---

[20]Section 13A-5-46(f), Ala. Code 1975, states:

"The decision of the jury to return an advisory verdict recommending a sentence of life imprisonment without parole must be based on a vote of a majority of the jurors. The decision of the jury to recommend a sentence of death must be based on a vote of at least 10 jurors. The verdict of the jury must be in writing and must specify the vote."

been part of Alabama's Criminal Code for more than 40 years, and the United States Supreme Court has yet to hold that a jury's less-than-unanimous sentencing verdict violates any part of the United States Constitution."

Henderson v. State, [Ms. CR-21-0044, May 3, 2024] ___ So. 3d ___, ___ (Ala. Crim. App. 2024). See also Newton v. State, [Ms. CR-2023-0953, Sept. 27, 2024] ___ So. 3d ___ (Ala. Crim. App. 2024); Smith v. State, 424 So. 3d 934, 957 (Ala. Crim. App. 2024). Based on this Court's holdings in Keaton and Henderson, Perez is due no relief on this claim.

XIV.

Perez next argues that his sentence of death violates state and federal law because, he says, it is grossly disproportionate to sentences in similar cases. Perez argues that his "sentence is disproportionate in comparison to similar, or even more aggravated, cases involving shooting deaths of law enforcement officers." (Perez's brief at p. 111.) To support this argument, Perez cites Russell v. State, 272 So. 3d 1134 (Ala. Crim. App. 2017), and Jackson v. State, 169 So. 3d 1 (Ala. Crim. App. 2010).[21]

---

[21]We note that, in Russell, the defendant was originally sentenced to death, but the case was remanded for a new sentencing hearing after this Court found that the circuit court had erroneously applied an aggravating circumstance. Russell v. State, 272 So. 3d at 1196.

However, our research shows that the sentence in this case is not disproportionate to sentences imposed in similar cases involving the murder of a police officer. See Woodward v. State, 123 So. 3d 989, 1059 (Ala. Crim. App. 2011); Albarran v. State, 96 So. 3d 131, 215 (Ala. Crim. App. 2011); Woods v. State, 13 So. 3d 1, 42 (Ala. Crim. App. 2007); McNabb v. State, 887 So. 2d 929, 993 (Ala. Crim. App. 2001); Centobie v. State, 861 So. 2d 111, 1145 (Ala. Crim. App. 2001). Thus, Perez is due no relief on this claim.

## XV.

Last, § 13A-5-53, Ala. Code 1975, requires that this Court address the propriety of Perez's sentence of death. Our review shows that the death sentence was not imposed under the "influence of passion, prejudice, or any other arbitrary factor." § 13A-5-53(b)(1), Ala. Code 1975.

---

In Jackson, the defendant was originally sentenced to death, but, because of defects in the sentencing order, the circuit court on remand sentenced Jackson to life imprisonment without the possibility of parole. Jackson v. State, 169 So. 3d at 117-18 (opinion on return to remand).

The jury unanimously found that the "the capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody." 13A-5-49(5), Ala. Code 1975.

In mitigation, Perez presented the testimony of seven witnesses at the penalty phase. Eugene Perez, Perez's brother, testified that he communicates with Perez every week and that Perez has frequently expressed remorse for shooting Off. Tuder. (R. 6130.) Perez's father, Francisco Perez, testified that Perez was his first son, that Perez struggled in school, that he had been absent from his son's life during his childhood, that Perez has a great work ethic, and that Perez did not graduate high school but got his GED. Savannah Brewer testified that she is the mother of Perez's son, that his son is named Mateo, that he was four years old at the time of trial, and that he frequently communicates with his father. Ryreizcia Perez testified that she is Perez's sister, that they speak weekly, and that they have a good relationship. Tiffany Perez, Perez's mother, testified that Perez is her oldest child, that he helped her with his younger siblings, and that he had been diagnosed with ADHD (attention-deficit-hyperactivity-disorder). (R. 6213.) Dr. Stephen Zieman, a licensed psychologist specializing in clinical neuropsychology,

testified that he had examined Perez for 12 hours while he was in the Mobile Metro jail, that it was his opinion that Perez has ADHD, and that Perez has low verbal comprehension. Dr. Zieman testified that a human brain does not fully mature until a person is around 25 years of age and that a 19-year-old would have "five to six years of maturation to occur before the brain gets fully developed." (R. 6176.)[22]

According to § 13A-5-53(b)(2), Ala. Code 1975, this Court has independently weighed the aggravating and the mitigating circumstances and are confident that the sentence of death was the appropriate sentence in this case.

Previously, we addressed whether Perez's sentence of death was disproportionate to the sentences imposed in similar cases. Perez's sentence is neither excessive nor disproportionate to the penalties imposed in similar capital-murder cases. § 13A-5-53(b)(3), Ala. Code 1975.

---

[22]In rebuttal, the State presented the testimony of Dr. Jessica Kirk, a pediatric doctor. She testified that, "even if you're three years behind the curve, the average, you're still 17 by the time your brain has been able to really grasp that consequences of my action, cause and effect, future oriented thinking that an adult would have." (R. 6263-64.)

For the above-stated reasons, we affirm Perez's conviction for the capital murder of Off. Tuder and his sentence of death.

AFFIRMED.

Windom, P.J., and Minor and Anderson, JJ., concur. Cole, J., concurs in the result.